[No. F043273. Fifth Dist. Sept. 22, 2004.]

FRIENDS OF THE SANTA CLARA RIVER et al., Plaintiffs and
Appellants, v.
CASTAIC LAKE WATER AGENCY et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Stephan C. Volker, Stephan C. Volker and Gretchen E. Dent for Plaintiffs and Appellants.

Horvitz & Levy, William N. Hancock, Jon B. Eisenberg; McCormick, Kidman & Behrens, Russell G. Behrens and David D. Boyer for Defendants and Respondents Castaic Lake Water Agency and Santa Clarita Water Company.

Gatzke Dillon & Ballance, Mark J. Dillon, Michael S. Haberkorn and Heather S. Riley for Defendant and Respondent Valencia Water Company.

**OPINION**

**CORNELL, J.**—Friends of the Santa Clara River and the Sierra Club appeal from the denial of their petition for writ of mandate alleging an urban water management plan for parts of the Santa Clarita Valley was adopted in violation of the Urban Water Management Planning Act (UWMP Act), Water Code section 10610 et seq.[1] Among the many grounds for reversal asserted is

[1] All further statutory references are to the version of the Water Code in effect during 2000 unless otherwise indicated.

the failure of the urban water management plan to assess the reliability of the water supply obtained from two layers of an aquifer contaminated with perchlorate.

Certain aspects of the urban water management plan concerning the effects of perchlorate contamination on the groundwater supply can be summarized as follows. If there is a dry stretch, the districts plan to take more water from the Saugus Formation. If the perchlorate contamination impairs the supply of water taken from the Saugus Formation in dry years, the districts plan to restore full production capacity by treating the contaminated water. While the treatment facilities are being built, the districts have no plan to cover the reduction in water available from the Saugus Formation.

Thus, the plan's description of the perchlorate contamination and the method for addressing that contamination is flawed because it fails to (1) address the time needed to implement the available method for treating the contaminated water and (2) describe the reliability of the groundwater supply during that implementation period. As this gap in the reliability analysis is sufficient for reversal, we do not address the other challenges to the adoption of the plan.[2]

## FACTUAL AND PROCEDURAL SUMMARY

### I. *Parties*

Friends of the Santa Clara River is a nonprofit corporation organized under the laws of the State of California in 1993. Some of its members reside within the subject service area and are ratepayers. The Sierra Club is a nonprofit corporation formed under the laws of the State of California in 1892. These parties are referred to collectively as plaintiffs.

Castaic Lake Water Agency (CLWA) is a public agency created and governed by the uncodified Castaic Lake Water Agency Law. (Stats. 1962, 1st Ex. Sess., ch. 28, § 1, p. 208, reprinted at 72A West's Ann. Wat.—Appen. (1999 ed.) § 103-1 et seq., p. 487.) CLWA was formed to provide a supplemental supply of imported water to the water purveyors of the Santa Clarita Valley. Its area of wholesale water service covers approximately 195 square miles. CLWA contracts with California's Department of Water Resources for water from the State Water Project (SWP) and other sources, treats those supplies at its treatment plants, and delivers the treated water to water retailers within its area.

---

[2] The failure to address the other challenges should not give rise to any inference as to their merit.

Newhall County Water District (Newhall) is a district formed by election under California's County Water District Law (§ 30000 et seq.). Newhall is a retail water purveyor serving an area of approximately 34 square miles and supplies groundwater pumped from wells supplemented by imported water purchased from CLWA. At the end of 1999, Newhall served approximately 6,758 connections, i.e., accounts.[3]

Santa Clarita Water Company (SCWC) is a California corporation and retailer of water. SCWC's service area includes portions of the City of Santa Clarita and unincorporated areas of Los Angeles County in the communities of Saugus, Canyon Country and Newhall. SCWC supplies water from groundwater wells and imported water purchased from CLWA.[4] At the end of 1999, SCWC served approximately 21,100 connections.

Valencia Water Company (VWC) is a California corporation and retailer of water. VWC's service area is approximately 25 square miles and includes portions of the City of Santa Clarita, the community of Valencia, and the unincorporated areas of Castaic and Stevenson Ranch. VWC supplies water from groundwater wells and imported water purchased from CLWA. At the end of 1999, VWC served approximately 20,865 connections.

CLWA, Newhall, SCWC and VWC are referred to collectively as defendants.

Defendants jointly caused the preparation of the 2000 Urban Water Management Plan (UWMP) under the UWMP Act to cover the service area of CLWA.

## II. *Sources of Water for the Santa Clarita Valley*

Historically, the Santa Clarita Valley obtained its water supply from an underground water basin, or aquifer, that is about 84 square miles and is divided into an upper and lower level. The shallow level, called the Alluvial Aquifer, underlies the Santa Clara River and its tributaries. Water from this layer is obtained from wells up to 200 feet deep. Beneath the Alluvial Aquifer is a deeper layer of groundwater called the Saugus Formation. Water from the Saugus Formation is pumped from wells extending to approximately 2,000 feet in depth.

---

[3] On May 20, 2004, Newhall filed a request for withdrawal of its brief that did not explain the reason for the request but acknowledged that if withdrawal was granted, this court, in accordance with California Rules of Court, rule 17(a)(2), would decide the appeal based on the record, the opening brief, the briefs of the other defendants, and oral argument.

[4] The relationship between CLWA and SCWC was, at one time, more than that of wholesaler and retailer. (See *Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987 [109 Cal.Rptr.2d 454] [writ of mandate sought to compel CLWA to divest itself of its ownership of all stock of SCWC].)

Based on historical production, the UWMP estimates (1) the Alluvial Aquifer will supply 30,000 to 40,000 acre-feet per year in normal weather years and 30,000 to 35,000 acre-feet per year in dry years, and (2) the Saugus Formation will supply 7,500 to 15,000 acre-feet per year in normal weather years and 11,000 to 15,000 acre-feet per year in dry years. At the time the UWMP was adopted, groundwater from the aquifer accounted for approximately 54 percent of the water supplied in the CLWA service area.

Since 1980, imported water from the SWP has supplemented local supplies to meet community water requirements. CLWA owns three entitlements to water from the SWP that total 95,200 acre-feet per year.[5] In 1966, CLWA entered into a contract with the SWP for 41,500 acre-feet of water per year. In the 1980's, CLWA purchased an entitlement to 12,700 acre-feet per year of SWP water from a Kern County water district. In 1999, CLWA acquired an entitlement to 41,000 acre-feet per year of SWP water from the Kern County Water Agency and its member district, Wheeler Ridge-Maricopa Water Storage District.[6]

III.  *Proposal and Adoption of the UWMP*

On Wednesday, November 22, 2000, defendants released a draft of the UWMP to the public for review and comment. CLWA indicated that public comments would be accepted only if received by it by 6:00 p.m., December 7, 2000.

The general manager of the United Water Conservation District sent a comment letter that expressed concerns about (1) the way the UWMP's draft presented existing and future water supplies, (2) reliance on groundwater banking projects that were unavailable to CLWA or years away from operation, and (3) the uncertainty of how the Saugus Formation will react to the higher levels of pumping proposed. In particular, the letter states: "In the legislation concerning Urban Water Management Plans, agencies are asked to consider existing and future sources of water. This is particularly useful to those using the Plan, since supply shortfalls can be recognized and future projects can be identified to supplement the existing sources of water.

---

[5] This annual contractual entitlement represented about 2.3 percent of the 4.2 million acre-feet per year the SWP was contracted to deliver to 29 contracting agencies. The California Department of Water Resources' contractual obligations to deliver water through the SWP, and the reliability of the delivery, is discussed in greater detail in *Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 908, footnote 5 [100 Cal.Rptr.2d 173].

[6] The agreement for the acquisition is described in *Friends of the Santa Clara River v. Castaic Lake Water Agency* (2002) 95 Cal.App.4th 1373, 1375 [116 Cal.Rptr.2d 54].

Our largest concern is that the draft of the Plan tends to combine existing sources with future potential sources so that it is difficult to establish where you are now and where you need to go. Thus, it is difficult to determine the present state of the supply and the timing of need for specific future projects. An example, which we will explain in more detail below, is the listing of various out-of-area storage projects as part of the year 2000 water supply (e.g., Figure 1-12). This approach implies that these projects are needed now (they are not) and that they could supply water to [CLWA] now (they cannot)."

On December 6, 2000, defendants conducted a joint public hearing concerning the UWMP. On December 20, 2000, the boards of the defendant water agencies held a joint meeting and approved the UWMP. CLWA submitted the UWMP to the California Department of Water Resources, and the submission was completed on February 5, 2001.

IV. *Lawsuit*

On April 23, 2001, plaintiffs filed a verified petition for writ of mandate challenging defendants' approval of the UWMP based on alleged violations of the UWMP Act and the public trust doctrine. The County of Ventura also filed a petition for writ of mandate challenging defendants' approval of the UWMP. The two petitions were consolidated into a single case and transferred to the Kern Superior Court.

Plaintiffs' cause of action based on the public trust doctrine was dismissed without leave to amend as a result of demurrers filed by defendants. Plaintiffs' cause of action based on violations of the UWMP Act was heard on the merits by the superior court on January 21, 2003, and February 4, 2003.

On April 8, 2003, the superior court filed an "Order and Findings: Statement of Decision" in which it denied the petitions for writ of mandate.[7] Defendants filed memoranda of costs. Defendants CLWA and SCWC jointly requested costs in the amount of $59,179.04. Defendant VWC claimed $8,416.78 in costs. Plaintiffs filed a motion to tax costs that challenged the recovery of certain costs related to the preparation of the administrative record,[8] such as "the cost of copies, including Bates stamping ($49,203.77), offsite duplication ($132.84 and $430.45), binders ($1,175.84, $421.53 and

---

[7] The County of Ventura did not appeal from the denial of its petition.

[8] The administrative record of proceedings submitted to the superior court was organized into 37 three-ring binders and contained 17,766 pages.

$177.49), and [VWC's] administrative record charges ($4,191.31)."[9] The superior court heard the motion to tax costs on July 1, 2003, and awarded CLWA and SCWC costs in the amount of $55,469.72 and awarded VWC costs in the amount of $6,575.06.

Subsequently, judgment was entered in favor of defendants and plaintiffs appealed.

## DISCUSSION

In 1983, the Legislature adopted the UWMP Act to promote the active management of urban water demands and efficient water usage in order to protect the people of the state and their water resources. (Stats. 1983, ch. 1009, § 1, p. 3555.) To achieve the goal of water conservation and efficient use, urban water suppliers are required to develop water management plans that include long-range planning to ensure adequate water supplies to serve existing customers and future demands for water. (§ 10610.2, subds. (d) & (e).) The plans must consider a 20-year time horizon (§ 10631, subd. (a)) and must be updated "at least once every five years on or before December 31, in years ending in five and zero" (§ 10621, subd. (a)). The UWMP Act requires plans to address specific issues. (§§ 10631, 10632 & 10633.) It also sets forth the procedural steps that urban water suppliers must follow when preparing, reviewing, and amending their plans. (§§ 10640–10645; see generally Waterman, *Addressing California's Uncertain Water Future By Coordinating Long-Term Land Use and Water Planning: Is A Water Element in the General Plan the Next Step?* (2004) 31 Ecology L.Q. 117, 162–166 [overview of the UWMP Act].)

### I. *Standard of Review*

In a mandate proceeding to review the decision of a public agency to adopt an urban water management plan, the standard of our review is set forth in section 10651, which provides: "In any action or proceeding to attack, review, set aside, void, or annul a plan, or an action taken pursuant to the plan by an urban water supplier on the grounds of noncompliance with this part, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse

---

[9] The invoice from Whitmont Legal Copying, Inc., to counsel for CLWA and SCWC in the amount of $49,203.77 for copies and Bates labeling appears to cover the production of 16 copies of the administrative record. After subtracting the $1,065.96 charged to generate and apply the Bates labels, the average cost per page for the copies of the administrative record came to approximately 16.93 cents (($49,203.77 − $1,065.96) / (17,766 pages x 16 copies) = $0.16934 per page).

of discretion is established if the supplier has not proceeded in a manner required by law or if the action by the water supplier is not supported by substantial evidence."

Although no published decision has applied section 10651, the statutory language is similar to Public Resources Code section 21168.5, which applies to some of the mandamus proceedings brought under the California Environmental Quality Act (CEQA), Public Resources Code section 21000 et seq.

■ The role of an appellate court in reviewing an administrative record for a "prejudicial abuse of discretion" under section 10651 is precisely the same as the role of the superior court and, therefore, the lower court's findings of fact and conclusions of law are not binding on the appellate court. (See *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 722 [32 Cal.Rptr.2d 704] [review conducted under Pub. Resources Code, § 21168.5].)

Plaintiffs contend that the defendants "ha[ve] not proceeded in a manner required by law" as that phrase is used in section 10651 and thus have prejudicially abused their discretion in adopting the UWMP. In particular, plaintiffs claim the UWMP does not comply with section 10631 because it (1) erroneously conflates existing sources with planned sources, (2) improperly characterizes supplies that are merely potential as "planned sources of water available to the supplier" (§ 10631, subd. (b)), and (3) fails to evaluate adequately the reliability of existing sources of water, such as groundwater from the aquifers and imported water from the SWP. Plaintiffs also contend that many of the findings of fact made in the UWMP are not supported by substantial evidence.

Defendants argue that all of the deficiencies alleged by plaintiffs are merely claims that the weight of the evidence does not support the conclusions of the agencies. As it is not our function to reweigh the evidence, but to determine if there is substantial evidence to support the findings of the UWMP, the plaintiffs must fail if there is such substantial evidence. Defendants claim that such substantial evidence exists in the record. Defendants also seem to imply that since the UWMP is subject to modification at any time and must be reviewed every five years (§ 10621, subd. (a)), any deficiency is not prejudicial.

## II. *Reliability of Groundwater Sources and Perchlorate Contamination*

Plaintiffs have raised a number of issues concerning the discussion in the UWMP regarding the quantity and quality of available groundwater. Some of the issues relate to the perchlorate contamination of the groundwater.

## A. *Testimony Regarding Perchlorate Contamination*

To support their claims concerning the inadequacy of the UWMP's discussion of perchlorate contamination, plaintiffs cite the following testimony given before the Public Utilities Commission by Steven B. Bachman, a geologist employed by the primary water wholesaler in the County of Ventura who also does consulting work for the County of Ventura.

"There is a significant area of perchlorate contamination to the east of the wells that pump from the Saugus Aquifer. The perchlorate has seeped into the Saugus Aquifer and has flowed westward towards the wells, shutting down 25 percent of the total Saugus Aquifer wells. [¶] . . . [¶]

"The extent of the perchlorate contamination in the Saugus Aquifer is not yet known, largely because there is a lack of wells to monitor west of well VWC No. 157. . . . Perchlorate that is still in the soils at the contamination site will be 'a long-term source of contamination' that will continue to reach the aquifers as rains and runoff push the contaminants in the soil into the groundwater system. . . . [¶] . . . [¶]

"The concentration of perchlorate in the production wells probably represents the leading edge of a much larger plume of higher concentrations of perchlorate. The total area of the Saugus Aquifer contaminated by the perchlorate has yet to be fully defined. We do know that the contaminant has migrated a minimum of 2 miles through the subsurface and over land to contaminate the vital pumping areas. (Exhibit 23.) Since the groundwater gradients in the contaminated area in the Saugus are towards the west, the contaminant is likely to continue to migrate further west and northwest. Time of travel from the soil contamination sites to the deep Saugus wells implies that the contaminant has been moving between 1 to 3 feet per day within the Saugus Aquifer. This implies that the perchlorate could impact [VWC's] well No. 201 as early as next year. Further down gradient is [VWC's] well No. 160."

Also, Richard D. McJunkin, a senior hydrogeologist with the California Department of Toxic Substances Control, testified that increased pumping of water from wells near the contamination site will accelerate the flow of the perchlorate contamination.

## B. *Contents of UWMP*

Perchlorate contamination is discussed in chapters 1, 2 and 6 of the UWMP. Chapter 1 of the UWMP is titled Introduction and Summary. Section 1.6 of the UWMP describes the water supply, including groundwater taken

from both layers of the underground water basin. Section 1.6A. of the UWMP contains the following summary of the quality of the groundwater: "Groundwater quality can be compromised by the presence of contaminants. Perchlorate was recently discovered in Saugus Formation groundwater at a site formerly occupied by an industry located in the area. Wells found exceeding the legal limit of this contaminant were shut down, and a groundwater cleanup plan is being developed using proven treatment methods which can restore full production capability."

Chapter 2 of the UWMP is titled Water Supply Resources. The introductory paragraphs in that chapter contain the following statements about groundwater and perchlorate contamination: "There is a range of opinion about issues such as the annual yield capability from groundwater basins. Accordingly, the [UWMP] recognizes that active management of resources may be necessary to achieve the projected supply. A number of management activities are thus described in this chapter, such as a water treatment program to remove perchlorates from the Saugus Formation. Many similar programs have been successfully implemented, including the water recharge and water quality management programs of groundwater in Orange County, which in recent years have enhanced the annual yield from this important source of local supply. Although there are water supply and water quality issues to be addressed in relation to groundwater supplies, the availability of active management options to address these issues creates a high probability that the annual yields discussed in this chapter can be sustained."

The "water treatment program to remove perchlorates from the Saugus Formation" is described subsequently in section 2.1A. of the UWMP as follows:

"In addition to [total dissolved solids] concerns, water quality problems have been observed in Southern California recently that could affect groundwater supply availability, in particular, the local discovery of perchlorate. Perchlorate is used in the manufacture of solid rocket propellants, munitions, and fireworks, and can be treated and removed from groundwater. Aerojet has implemented biological treatment in Rancho Cordova, California and is re-injecting the treated water into the ground. The California Department of Health Services has not yet approved biological treatment for a drinking water end use.

"An ion exchange process has also been developed that successfully treats and removes perchlorate. This process is called the continuous ion exchange

system. The system has been successfully piloted at Jet Propulsion Laboratory and at a location in Main San Gabriel Basin. The treatment cost for this process is about $300 per acre-foot excluding the cost of brine disposal. Discussions are currently underway with the owners of the property identified as the source of the local contamination on groundwater cleanup. No perchlorate has been detected in Alluvial Aquifer wells to date, although some has been detected in monitoring wells located on the contaminating site."

These two paragraphs and the above quoted statement from the introductory materials are the only mention of perchlorate contamination in chapter 2 of the UWMP and its effect on the reliability or availability of water supplied from the aquifers.

Chapter 4 of the UWMP is titled Reliability Planning and does not mention perchlorate contamination or describe its effect on the reliability of the aquifers as a source of groundwater.

The description in chapters 1 and 2 of the UWMP of perchlorate contamination and its impact on the supply of water from the underground water basin can be summarized as follows: (1) An unspecified number of wells in the Saugus Formation have been shut down because of perchlorate contamination; (2) perchlorate has not been found in supply wells in the Alluvial Aquifer but has been found in monitoring wells on the contaminating site; (3) perchlorate contamination in water can be treated with an ion exchange process at a cost of over $300 per acre-foot; (4) defendants and the owners of the site contaminated with perchlorate are discussing groundwater cleanup; and (5) available options to address the perchlorate issues create a high probability that the annual yields discussed in the UWMP can be sustained.[10]

### C. Matters Not Discussed in the UWMP

The UWMP mentions "a groundwater cleanup plan . . . being developed" (UWMP, § 1.6A.) to address the perchlorate contamination, but it does not mention what stage of development has been reached or how much longer it will take to complete and implement that plan.[11] Assuming the length of time

---

[10] Section 6.4 of the UWMP summarizes the earlier discussion of the perchlorate contamination as follows: "The recent detection of perchlorate in the Saugus Formation is an example of prior contamination due to industrial chemical processes. The few wells affected have been shut down, effective treatment technologies have been developed, and a plan is being worked out to remove the contamination from the groundwater."

[11] As a result of the failure to describe the timing, the UWMP also does not describe plans to replace contaminated sources with alternative sources of water until the treatment option is implemented. (See § 10631, subd. (c).)

needed to implement the plan is uncertain, the UWMP does not describe the factors that have caused that uncertainty.[12]

Timing considerations of other aspects of the perchlorate contamination also affect the reliability of the supply of groundwater. For instance, the UWMP does not state how fast the perchlorate contamination is spreading in either the Saugus Formation or the Alluvial Aquifer, how far it might reach within the 20-year period covered by the UWMP, or how the rate of migration is affected by factors, such as the increased use of Saugus Formation in dry years. To the extent that the answers to these timing issues are uncertain, the UWMP does not discuss how this uncertainty affects the reliability of the supply of groundwater. More specifically, the UWMP does not state how it reached the implicit determination that the quantities of groundwater set forth in the UWMP met the reliability criterion of 90 percent, i.e., there was a 90 percent level of certainty that those amounts would be available.[13]

The lack of information in the UWMP regarding how long it would take to implement the ion exchange process to treat perchlorate contaminated water pumped from the Saugus Formation or the Alluvial Aquifer stands in contrast to figure 1-14 in the UWMP, which sets forth a program implementation schedule for other programs related to water supply, such as (1) drilling new wells in the Saugus Formation (feasibility-six months, design-three months, construction & permitting-nine months), (2) negotiating water transfer agreements (15 months), (3) water recycling, (4) water banking programs, and (5) desalination.

### D. *The UWMP Did Not Comply with Section 10631*

■ Section 10631 specifies some of the mandatory contents of an urban water management plan. Under subdivision (b) of section 10631, a plan shall "[i]dentify and quantify, to the extent practicable, the existing and planned sources of water available to the supplier over . . . five-year increments" to 20 years or as far as data is available. Subdivision (c) of section 10631 provides:

"Describe the reliability of the water supply and vulnerability to seasonal or climatic shortage, to the extent practicable, and provide data for each of

---

[12] For example, implementation of the ion exchange process may be subject to review under CEQA because the disposal of the brine created by that process may have a significant environmental impact and the CEQA review process would increase the amount of time needed to implement the treatment process.

[13] Section 1.7A. of the UWMP states that "The [reliability] criterion set for this [UWMP] is that there must be a water supply sufficient to meet projected demands 90 percent of the time, or in 18 out of the next 20 years."

the following: [¶] (1) An average water year. [¶] (2) A single dry water year. [¶] (3) Multiple dry water years.

"For any water source that may not be available at a consistent level of use, given specific legal, environmental, water quality, or climatic factors, describe plans to replace that source with alternative sources or water demand management measures, to the extent practicable."

Plaintiffs contend the UWMP fails to comply with section 10631 in that it does not evaluate adequately the reliability of the Saugus Formation and the Alluvial Aquifer as sources of water because the UWMP understates the perchlorate contamination and ignores the migration of that contamination.

■ When any water source may not be available at a consistent level of use, the UWMP must describe plans to replace that source with alternative sources. (§ 10631, subd. (c).) In this case, the Saugus Formation and Alluvial Aquifer may be sources that are not available at a consistent level because of the environmental and water quality concerns raised by the perchlorate contamination. Furthermore, the implementation of a process to treat water pumped from those sources cannot be implemented instantaneously. If the decision to implement a water treatment process is not made until a dry year has begun or until after the start of multiple dry years, the reliability of the water supply available during those dry periods could be affected significantly.

■ Accordingly, we conclude that the UWMP's description of the reliability of the groundwater supplied from the Saugus Formation and Alluvial Aquifer is inadequate under subdivision (c) of section 10631 because of the failure to address timing issues related to the perchlorate contamination.[14] Simply stating that a treatment technology is available and that a groundwater treatment plan is being developed without discussing when the plan may need to be implemented and the amount of time needed for its implementation leaves a temporal gap in the description of the reliability of the water source. This gap renders the UWMP legally inadequate.

---

[14] This holding can be restated in the language of section 10610.2, subdivision (d) as follows. Because of the failure to address the timing issues, the UWMP does not show that the defendants have made "every effort to ensure the appropriate level of reliability in [their] water service sufficient to meet the needs of [their] various categories of customers during normal, dry, and multiple dry water years." (*Ibid.*)

Without a reliable analysis of the availability of water, the UWMP is fatally flawed. The public and the various governmental entities that rely on the UWMP may be seriously misled by it and, if the wrong set of circumstances occur,[15] the consequences to those who relied on the UWMP, as well as those who share a water supply with them, could be severe. The ability to modify and review the plan does not overcome the initial failure.

The judgment must be reversed as defendants did not proceed in a manner required by law in their preparation of the UWMP, thus prejudicially abusing their discretion. (§ 10651.)

III. *Recoverable Costs*

As the judgment against plaintiffs will be reversed, we need not address the issues raised in connection with their attack on the costs awarded to defendants, such as whether defendants were entitled to recover the expense incurred for *additional* copies of the administrative record (see Cal. Administrative Mandamus (Cont.Ed.Bar 3d ed. 2003) Recoverable Costs, § 10.15, pp. 360–361 (rev. 5/04)).

## DISPOSITION

The judgment is reversed and the matter is remanded to the superior court with directions to grant the petition for a writ of mandate vacating defendants' approval of the 2000 Urban Water Management Plan. Friends of the Santa Clara River and Sierra Club shall recover their costs on appeal from Castaic Lake Water Agency, Santa Clarita Water Company and Valencia Water Company. Newhall County Water District's request to withdraw its respondent's brief is granted.

Vartabedian, Acting P. J., and Buckley, J., concurred.

A petition for a rehearing was denied October 14, 2004.

---

[15] Those circumstances could include a prolonged drought, increased reliance on groundwater from the Saugus Formation, accelerated spread of the perchlorate contamination within the formation, and problems or delays in implementing the ion exchange.