[No. B175580. Second Dist., Div. Eight. Nov. 2, 2005.]

CALIFORNIA OAK FOUNDATION et al., Plaintiffs and Appellants, v.
CITY OF SANTA CLARITA, Defendant and Respondent;
GATE KING PROPERTIES, Real Party in Interest and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

1222

COUNSEL

Law Offices of Babak Naficy and Babak Naficy for Plaintiffs and Appellants.

Rossmann and Moore, Antonio Rossmann, Roger B. Moore and David R. Owen for Planning and Conservation League as Amicus Curiae on behalf of Plaintiffs and Appellants.

Burke, Williams & Sorensen and Stephen R. Onstot for Defendant and Respondent.

Morrison & Foerster and Anne E. Mudge for Real Party in Interest and Respondent.

OPINION

**BOLAND, J.—**

### SUMMARY

This appeal arises under the California Environmental Quality Act (CEQA), Public Resources Code section 21000 et seq.[1] The California Oak Foundation and the Santa Clarita Organization for Planning the Environment (collectively, SCOPE) petitioned the trial court for a writ of mandate. The petition requested the trial court to order the City of Santa Clarita (City) to set aside its certification of the final environmental impact report (EIR) and related resolutions approving an industrial development project proposed by Gate King Properties.

The trial court denied SCOPE's petition, and SCOPE appeals, arguing that:

—Insufficient evidence exists to support the EIR's conclusion that sufficient water supplies exist for the project.

—The City violated its Ridgeline Preservation and Hillside Development Ordinance by granting the project an exemption from the ordinance as an "innovative development" alternative.

—The EIR was defective because it did not require adequate surveys of the site to determine the presence or absence of several rare plant species prior to

---

[1] All statutory references are to the Public Resources Code, unless otherwise specified.

certification of the project, and otherwise failed to require adequate mitigation measures with respect to these plant species.

We conclude the trial court erred in approving the EIR because the section of the EIR discussing water supplies is inadequate. We find no other defects in the EIR, and further conclude that the City did not violate its ridgeline preservation ordinance.

## FACTUAL AND PROCEDURAL BACKGROUND

Gate-King Industrial Park is a proposed industrial/business park. The project as originally proposed involved the subdivision of 584 acres of developed and undeveloped land in the southern portion of Santa Clarita. The greater part of the site, historically known as Needham Ranch, is undeveloped, natural terrain containing more than 10,000 oak trees. Site elevations range from about 1,350 feet to 1,900 feet above mean sea level. A north-south running primary ridgeline extends along the central portion of the site, and two secondary ridgelines extend east-west toward Sierra Highway and the Metropolitan Transit Authority rail line.[2]

Gate King Properties proposed to subdivide the 584-acre project site. Gate King's original proposal involved the development of 170.1 acres, accommodating about 4.45 million square feet of industrial/commercial development, with an additional 64.3 acres consisting of rights-of-way (including public streets) and water wells. The remaining 349.6 acres were to include a combination of slopes, trails and areas within the industrial/commercial lots that would remain undeveloped due to the presence of large oak groves, as well as 220.6 acres of dedicated open space.[3] The project called for extensive grading, affecting the primary and secondary ridgelines traversing the site,

---

[2] The site is west of the Antelope Valley Freeway and is bounded by Sierra Highway to the east and San Fernando Road to the north. Pine Street and the Metropolitan Transit Authority (MTA) right-of-way are located along the western boundary, and undeveloped mountainous terrain is located to the south. Approximately 23 percent of the site is developed with a variety of uses, including cemetery facilities, oil well production facilities, a city disposal site, a storage facility, a concrete recycling facility and associated access roads, about three acres of residential uses, an MTA disposal site, and oil and gas rights-of-way and access roads.

[3] The commercial and industrial buildout of the site required amending the land use designations and zoning for parts of the site. Before the changes, approximately 58 percent of the site was designated for industrial/commercial uses; 21 percent for residential use; 16 percent for open space; and 5 percent for community commercial (retail) uses. The general plan's land use designation and zoning changes required by the project eliminated the residential and commercial designations from the site, increased the area designated for industrial uses slightly, and increased the area designated for open space to more than 40 percent.

with total earth movement of 7.24 million cubic yards. The project as proposed also called for the removal of at least 1,709 oak trees, including two heritage oak trees.

After circulation of a draft EIR for public review, the project was modified. As ultimately approved by the City, the site size was reduced to 508.2 acres (75.8 acres having been donated to the City). The buildable area of the project was reduced to 161 acres, accommodating about 4.2 million square feet of industrial/commercial development, and 207.6 acres of dedicated open space. Grading was also reduced, with earth movement totaling 5.7 million cubic yards, and the number of oak trees to be removed was reduced by 465 trees.

The City certified the final EIR on June 24, 2003, and SCOPE sought a writ of mandate decertifying the EIR. Judgment was entered denying SCOPE's petition for a writ of mandate on March 22, 2004. The relevant details of the EIR, and SCOPE's challenges to the City's actions in approving the project, will be set out in the course of our discussion.

## DISCUSSION

We first describe the settled principles guiding our review in CEQA cases, and then address each of the challenges SCOPE interposes to the adequacy of the final EIR and to the City's application of the ordinance governing ridgeline preservation and hillside development.

I. *CEQA Principles and the Standard of Review.*

■ A comprehensive discussion of CEQA and the purposes and role of an EIR appears in *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390–393 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*). The Legislature intended CEQA to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statutory language. (47 Cal.3d at p. 390.) ■ CEQA describes the EIR as an informational document. Its purpose is to provide public agencies, and the public, with detailed information about the effect a proposed project is likely to have on the environment; to list ways in which the significant effects of a project might be minimized; and to indicate alternatives to a project. (§ 21061.) Before approving a project, the lead agency—here, the City—must find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits. (*Laurel Heights, supra*, 47 Cal.3d at p. 391, citing §§ 21002, 21002.1 and 21081.) The EIR has been described as " 'the heart of CEQA,' " an " 'environmental "alarm

bell," ' " and a "document of accountability." (*Laurel Heights, supra,* 47 Cal.3d at p. 392.) "If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees." (*Ibid.*)

■ In an action to set aside an agency's decision under CEQA, the trial court's inquiry extends only to whether a prejudicial abuse of discretion has occurred. Abuse of discretion occurs if the agency has not proceeded in a manner required by law, or if its decision is not supported by substantial evidence. The court passes only upon the EIR's sufficiency as an informative document, not upon the correctness of its environmental conclusions. (*Laurel Heights, supra,* 47 Cal.3d at p. 392.) CEQA Guidelines, which implement the provisions of CEQA, define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a).) *Laurel Heights* cautions that an agency's approval of an EIR may not be set aside on the ground that an opposite conclusion would have been equally or more reasonable. (*Laurel Heights, supra,* 47 Cal.3d at p. 393.) CEQA's purpose is to compel government to make decisions with environmental consequences in mind, but CEQA " 'does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " (*Laurel Heights* at p. 393, quoting *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].)

■ This court's inquiry is the same as that of the trial court. The appellate court reviews the administrative record independently to determine whether the City complied with CEQA. (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 912 [100 Cal.Rptr.2d 173] (*PCL*).)

II. *The Water Supply Issues.*

We agree with SCOPE's contention that the EIR must be set aside because substantial evidence does not support the conclusion that sufficient water supplies exist for the project. SCOPE's challenge to the EIR, in which amicus curiae Planning and Conservation League joins, has two principal components: certain water entitlements relied upon by the City were "paper" water rather than actual deliverable water; and the EIR did not in any way attempt to quantify the impact of perchlorate contamination on the availability of groundwater from the Saugus Formation. Although we are not persuaded the

EIR's treatment of perchlorate contamination was insufficient, the EIR did not adequately inform the public about other uncertainties in the water supply.

To understand the matters at issue, we must first describe the sources of water for the Santa Clarita Valley, as well as several appellate court decisions relevant to the water supply issues. We then turn to the contents of the EIR, the comments elicited by the draft EIR, the City's responses to those comments, and finally to SCOPE's specific contentions.

### A. Water sources and legal background.

The Santa Clarita Valley historically obtained its water supply from an underground water basin or aquifer that is divided into a shallow level (the Alluvial Aquifer) and a deeper layer of groundwater called the Saugus Formation. Since 1980, however, the water supply has been supplemented with imported water to meet community water requirements. (*Friends of the Santa Clara River v. Castaic Lake Water Agency* (2004) 123 Cal.App.4th 1, 5–6 [19 Cal.Rptr.3d 625] (*Friends II*).) The Castaic Lake Water Agency (Castaic) is a public agency formed to provide the imported water to the water purveyors of the Santa Clarita Valley. Castaic contracts with California's Department of Water Resources for water from the State Water Project, treats the water, and delivers it to several water retailers in the Santa Clarita Valley. (*Id.* at p. 4.) One of these retailers is the Newhall County Water District (Newhall District), which serves the project site.

The State Water Project (the Project) was authorized in the 1950's. The Project was designed to become a complex system of reservoirs, dams, power plants and other facilities for the storage and delivery of 4.23 million acre-feet of water annually.[4] The Department of Water Resources (the Department) operates the facilities and manages the Project. When the Project began, the Department entered into individual long-term contracts with water suppliers throughout the state. These contractors, including Castaic, received entitlements to an annual amount of water, in return for which they repay a proportionate share of the financing and maintenance of the Project facilities. (*PCL, supra*, 83 Cal.App.4th at pp. 898–899.)

The entitlements Castaic and other contractors received under their contracts with the Department were predicated on the state's obligation to build out the Project so as to deliver 4.23 million acre-feet per year (AFY) to the

---

[4] "An acre-foot is 43,560 cubic feet. Colloquially, it is an irrigation-based measurement equaling the quantity of water required to cover an acre of land to a depth of one foot." (*Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 182, fn. 1 [29 Cal.Rptr.2d 128].)

contractors. However, the Project has never been completed, and the state cannot deliver 4.23 million AFY. The court in *PCL* observed that "[a]ctual, reliable water supply from the [Project] is more in the vicinity of 2 to 2.5 [million acre-feet] of water annually." (*PCL, supra,* 83 Cal.App.4th at p. 908, fn. 5.) The record in this case shows that in 1999, the Project delivered 3.1 million acre-feet and the 2000 projection was for 3.3 million acre-feet. Castaic and other contractors' entitlements "represent nothing more than hopes, expectations, water futures or . . . 'paper water.' "[5] (*Ibid.*)

By the late 1980's and early 1990's, water supplies were severely diminished as a result of a seven-year drought and other limitations, generating disputes among agricultural and urban water contractors and the Department about the distribution of the limited amount of water. (*PCL, supra,* 83 Cal.App.4th at p. 900.) In 1995, the parties settled these disputes in a statement of principles known as the Monterey Agreement. The Monterey Agreement changed the allocations between agricultural and urban contractors of entitlements to Project water, and permitted the transfer of entitlements up to 130,000 AFY from agricultural contractors to urban contractors on a willing buyer-willing seller basis. (*Friends of the Santa Clara River v. Castaic Lake Water Agency* (2002) 95 Cal.App.4th 1373, 1375 [116 Cal.Rptr.2d 54] (*Friends I*).)

Under the Monterey Agreement, Castaic purchased an entitlement to 41,000 AFY of Project water from the Kern County Water Agency and its member district (hereafter, Castaic purchase or 41,000 AFY entitlement). However:

—Because implementation of the Monterey Agreement would have potential adverse environmental impacts, an EIR was required. In September 2000, the court in *PCL, supra,* 83 Cal.App.4th 892, 907 concluded the EIR for implementation of the Monterey Agreement was inadequate. The EIR failed to provide a thorough examination of the environmental consequences, including the impact on land use planning, of the "no project" alternative to the Monterey Agreement. (*Id.* at p. 915.) Under the "no project" alternative, in the event of a threatened permanent water shortage, entitlements under the existing long-term contracts between the Department and the contractors would be proportionately reduced to reflect actual water delivery patterns. (*Id.* at pp. 900, 908–920.)

---

[5] "Paper water always was an illusion. 'Entitlements' is a misnomer, for contractors surely cannot be entitled to water nature refuses to provide or the body politic refuses to harvest, store, and deliver. Paper water represents the unfulfilled dreams of those who, steeped in the water culture of the 1960's, created the expectation that 4.23 [million acre-feet] of water could be delivered by a [State Water Project] built to capacity." (*PCL, supra,* 83 Cal.App.4th at p. 914, fn. 7.)

—In January 2002, the EIR for Castaic's purchase of entitlement to 41,000 AFY of Project water under the Monterey Agreement was also decertified. The EIR was decertified because it was expressly "tiered" upon—that is, it incorporated and relied upon—the EIR for the Monterey Agreement, which had been decertified in the *PCL* case.[6] (*Friends I, supra,* 95 Cal.App.4th at pp. 1387–1388.) The court found no defects in the EIR for the Castaic purchase other than the *PCL*/tiering problem.[7] (*Id.* at p. 1387.)

—Although the EIR for the Castaic purchase was decertified, the court did not enjoin implementation of the agreement for Castaic's purchase of the 41,000 AFY entitlement. As a result, the 41,000 AFY entitlement is available to Castaic during the pendency of the litigation over the Castaic purchase EIR.

—In February 2003, several months before the City certified the EIR for this project, the County of Los Angeles was ordered to vacate its certification of a final EIR for a mixed residential and commercial development in the Santa Clarita Valley. The court agreed with contentions by SCOPE that the EIR's water analysis was inadequate. (*Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2003) 106 Cal.App.4th 715 [131 Cal.Rptr.2d 186] (*SCOPE*).) The court observed the EIR failed to undertake an adequate analysis of the amount of water the State Water Project could actually deliver in wet, average and dry years. (*Id.* at p. 724.)

B. *The EIR information on water supplies.*

The draft EIR for the Gate-King project was circulated in January 2002 and included, as did the final EIR, the following observations about water supplies:

—Castaic's "current total water entitlement" from the State Water Project is 95,200 acre-feet of water per year. This 95,200 AFY entitlement includes

---

[6] The court observed that Castaic "may be able to cure the *PCL* problem by awaiting action by the [Department] complying with the *PCL* decision, then issuing a subsequent EIR, supplement to EIR, or addendum . . . tiering upon a newly certified Monterey Agreement EIR." (*Friends I, supra,* 95 Cal.App.4th at pp. 1387–1388.)

[7] Gate King requested, and is granted, judicial notice of various documents showing that on December 22, 2004—long after certification of the EIR in this case—Castaic certified a new final EIR for the purchase of the 41,000 AFY entitlement to State Water Project water from the Kern County agency. According to Castaic's resolution approving the project, the new EIR did not tier off the EIR for the Monterey Agreement and did not rely upon Castaic's 2000 Urban Water Management Plan, the validity of which was also in question. Planning and Conservation League and California Water Impact Network have challenged Castaic's decisions to certify the new EIR and approve the 41,000 AFY water transfer in lawsuits filed in Ventura County.

the 41,000 AFY entitlement that Castaic purchased under the Monterey Agreement, as described above.

—Castaic's State Water Project entitlement "can fluctuate from year to year based on a number of factors, including hydrologic conditions, the status of State Water Project facilities, construction, environmental requirements, and evolving policies for the Bay-Delta."[8]

—The EIR relied upon Castaic's "Urban Water Management Plan 2000" (UWMP 2000). The UWMP 2000 is a long-range planning tool prepared for the Castaic service area. Every urban water supplier is required by statute to prepare and adopt such a plan as a part of its responsibility for ensuring adequate water supplies. The UWMP's projected water usage for the Castaic service area accounted for build-out of the City, including development of the Gate-King project. According to the UWMP 2000, "water supplies are expected to be adequate throughout the 20-year Plan period under all conditions."[9] The draft EIR thus concluded that "no water supply shortages are expected within [Castaic's] service area throughout the 20-year UWMP period, if projected and local supplies are developed as indicated."

—The Castaic service area's total entitlement, including groundwater wells and imported water, is approximately 103,200 to 180,900 AFY during an average or normal rainfall year, and approximately 201,100 to 279,700 AFY during a dry year.[10]

—The UWMP "anticipates a projected normal/average year water usage of 75,100 acre-feet of water per year in the area. Therefore, the area would maintain a water supply surplus of 28,100 AFY. As demand for water increases in the future, additional water supplies are expected to be available from [Castaic]." The 28,100 AFY surplus is derived by subtracting projected

---

[8] According to the EIR, Castaic has developed a funded capital improvement program providing for the following activities to achieve water supply reliability: purchase of additional State Water Project supplies; implementation of recycled water programs; development of additional dry-year Saugus Formation supplies (new wells); enhancement of groundwater banking programs; and seawater desalination/water exchange.

[9] In September 2004, more than a year after final certification of the EIR in this case, the UWMP 2000's description of the reliability of groundwater supplies was found to be inadequate under the Water Code, because it failed to address timing issues related to perchlorate contamination discovered in Saugus Formation groundwater. (*Friends II, supra*, 123 Cal.App.4th at p. 14; see discussion *post*, pt. II.G.3.)

[10] The EIR notes that according to UWMP 2000, dry year supplies are greater than wet year supplies because the Newhall District (the project's water retailer) will tap reserves, including drilling new wells in the Saugus Formation and importing additional water.

usage of 75,100 AFY from the low-end figure for total entitlement (imported water and groundwater) of 103,200 in a normal rainfall year.[11]

—The Gate-King project would generate demand for an estimated 386 AFY, which represents 1.4 percent of the area's current excess supply of 28,100 AFY. The EIR states that according to the Newhall District, "adequate water supply is available to serve the water demand generated by the proposed project," and "impacts to water supplies are not considered significant."[12] While the EIR concludes that the impact of the project on water supply "would be less than significant without mitigation," it also states that "because of ongoing concerns about regional water supplies, impacts to water supply are considered Class II, significant but mitigable." The EIR recommended various water conservation features to minimize the project's impact on regional water supplies.[13]

### C. *Comments on the draft EIR.*

SCOPE's comments on the draft EIR asserted that the draft failed to adequately evaluate water supply. SCOPE asserted that:

—The City did not review or comply with the findings in *PCL, supra,* 83 Cal.App.4th 892 (decertifying the EIR for the Monterey Agreement) and *Friends I, supra,* 95 Cal.App.4th 1373 (decertifying the EIR for the Castaic purchase), which made it clear that the City should not rely on Castaic's full 95,200 AFY entitlement to State Water Project water.

—The Saugus Formation cannot be relied upon as a water supply resource until it is remediated. SCOPE attached copies of expert testimony from other cases and various reports relating to perchlorate contamination and concern over its spread. SCOPE also attached a Castaic memo on strategy to address the contamination. SCOPE observed that actual remediation would take

---

[11] The 103,200 AFY figure is the sum of 30,000 AFY of groundwater from the Alluvial Aquifer; 7,500 AFY of groundwater from the Saugus Formation; 1,700 AFY of recycled water; 56,800 AFY of State Water Project entitlements (59.7 percent of Castaic's total entitlement of 95,200, which includes the disputed 41,000 AFY); and 7,200 AFY from planned programs for future implementation (water transfers and desalination). The EIR also states that, while the Saugus Formation has been pumped to an average of slightly more than 7,000 AFY over the last 20 years, increases in pumpage from 15,000 (the maximum to which it has been pumped historically) to 25,000 to 40,000 AFY, "in a ramped manner, would be hydrologically feasible . . . ."

[12] If estimated demand for water generated by the project exceeded available existing or future supplies, the impact would be considered significant.

[13] These included interior water conservation measures, "as required by the State of California," such as low-flow toilets and self-closing faucets, and exterior water conservation features such as low-water-using plants.

"several additional years for facilities design and land acquisition before clean water is actually produced. The Santa Clarita water agencies are currently only pumping approximately 3000 AF per year from this source although the water agencies have reported that they can provide 40,000 AF in [their] Urban Water Management Plan. Again, it is an abuse of [discretion] to rely on information which the [Planning] Commission knows to be false."

—It was imperative for the City to "do its own analysis of the water supply for the Santa Clarita Valley to ensure that this project approval will stand," because the UWMP 2000 for the Santa Clarita Valley was then being litigated "due to its over-statement of water supply and understatement of demand." (See fn. 9, *ante.*) SCOPE asserted that reliance on the UWMP 2000 for sufficiency of water supply would result in the project approval being overturned if the UWMP litigation were successful.

D. *The City's response to SCOPE's comments.*

The City's response to SCOPE's comments in the final EIR was as follows:

—As required by statute, in January 2002 the City requested that the Newhall District provide a water supply assessment for the proposed project. On May 30, 2002, the Newhall District's Board approved its assessment of the water supply, concluding that water demand for the proposed project was included in UWMP 2000. The water supply assessment also indicated no current overdraft of the groundwater supplies upon which the Newhall District relies.

—The Newhall District assessment "indicates that water supplies available to the District could potentially be limited by three ongoing legal challenges" described in the assessment. The assessment in turn stated that the Newhall District's sources of supply were "subject to possible limitation as a result of the following pending litigation . . . ." The assessment then stated that:

—The District relies on imported water deliveries from Castaic, which has contract entitlements of State Water Project water totaling 95,200 AFY. Projections of water supply availability under those entitlements "are esti-mated to be the delivery of 50% of the entitlement 80% of the time."

—A portion of Castaic's State Water Project entitlements are derived from contracts entered into under the authority of the Monterey Agreement, and: "[The Monterey Agreement] has been challenged by the Planning and Conservation League and as a result of that litigation further environmental

assessment is going to be undertaken by the Department of Water Resources. The Friends of the Santa Clara River, another environmental group, has further challenged the recent EIR of Castaic Lake Water Agency which was tiered upon the Monterey [Agreement] EIR. This challenge is now under appellate court review. Finally, the Friends of the Santa Clara River and the County of Ventura have filed challenges to the adequacy of the District's Urban Water Management Plan which challenges are currently before the trial court."

As for SCOPE's comments on perchlorate contamination, the City acknowledged that: "perchlorate has been a concern associated with groundwater quality since it was detected in four wells in the eastern part of the Saugus Formation in 1997. Operation of the four wells has been suspended and purveyors are continuing to test for perchlorate in all active Alluvial and Saugus wells. However . . . several treatment technologies for the removal of perchlorate from water are currently available."[14]

E. *Appendix K.*

No changes were made in the draft EIR's analysis of water supplies, although SCOPE's comments and the City's responses are a part of the final EIR. The final EIR was circulated in October 2002, and was republished in June 2003, contemporaneously with the City's certification of the EIR. When it was republished, it included several additional appendices, including Appendix K, entitled "Additional Water Supply Information." Appendix K is a memorandum dated May 27, 2003, from the consultants who prepared the City's EIR, and was provided "to more directly address issues raised by the Court of Appeals" in *SCOPE, supra,* 106 Cal.App.4th 715. Appendix K includes the following information:

—Referring to Castaic's State Water Project entitlements, Appendix K states: "In addition, the availability of the 41,000 AFY obtained from the Kern County Water Agency . . . is not absolutely established because the EIR prepared for its transfer was recently invalidated and decertified" by *Friends I, supra,* 95 Cal.App.4th 1373.

—"In recognition of the fact that the entire 95,200 AFY entitlement may not be available in all years, the water supply projections contained in the 2000 UWMP . . . are based on a reduced delivery." The estimate assumes that 59.7 percent of the total entitlement (or 56,000 AFY) would be available in average-normal years, and 39.8 percent of the entitlement (or 37,900 AFY) would be available in dry years.

---

[14] The response also reported that the local water purveyors had filed a lawsuit against the former and present owners of the contaminated property, seeking payment by defendants of all necessary costs of response, removal of perchlorate, and so on.

—"[P]erchlorate has been a concern with respect to groundwater quality since it was detected in four wells in the eastern part of the Saugus Formation . . . in 1997. Operation of the four wells has been suspended and purveyors are continuing to test for perchlorate in all active Alluvial and Saugus wells. To date, no other wells have shown detectable levels of perchlorate . . . ."

—"Several treatment technologies for the removal of perchlorate from water are currently available. The DHS has issued a domestic water supply permit to deliver treated drinking water from contaminated wells to customers in the San Gabriel Valley. The approved technology is also available for use in the Santa Clarita Valley."

—In 2001, total water demand in the Santa Clarita Valley was 76,769 acre-feet, essentially unchanged from demand in 2000. The year 2001 demand was met by a combination of 41,413 acre-feet of local groundwater and 35,356 acre-feet of Water Project water. The UWMP 2000 projects water demand in the average/normal year to increase to about 102,500 acre-feet by 2020.

—The 386 AFY water demand associated with the Gate-King project represents about 0.5 percent of the total current demand in the Santa Clarita Valley.

—The primary uncertainty with respect to local water supply is the availability of Castaic's State Water Project entitlement. If the 41,000 AFY entitlement purchased from Kern County is available, water supplies "appear to be sufficient to meet projected growth in demand through 2020." If it is not, "water supplies may be insufficient to meet the projected increase in demand through 2020."

—"However, even without the additional 41,000 AFY, [Castaic] retains an entitlement of 54,200. Because this amount exceeds 2001 [Castaic] demand for [State Water Project] water by 18,844 acre-feet [actual Project water delivered was 35,356 AF], the 386 AFY increase in water demand associated with the proposed project would be well within the current entitlement."

—"Finally, the UWMP identifies several additional sources of water (water recycling, purchase of additional [State Water Project] supplies, desalination) that are expected to meet water demand projections over time. Since the proposed industrial park project's water demand is within that projected in the 2000 UWMP, would not exceed the current [State Water Project] entitlement, and would not significantly affect groundwater resources, water supplies appear to be adequate to serve the proposed development."

F. *The trial court's analysis.*

The trial court rejected SCOPE's contention that the EIR improperly relied on Castaic's entitlement to the 41,000 AFY and failed to discuss the pending litigation. The court found the EIR's conclusion—that sufficient actual water supply was available to serve the project and therefore water supply impacts were not significant—was based on substantial evidence, namely:

—Newhall District's May 30, 2002 water supply assessment, which relied on the UWMP 2000. The UWMP's projections were based on reduced delivery by Castaic (59.7 percent in average-normal years and 39.8 percent in dry years), and the UWMP concluded that supplies would be adequate to serve demand to 2020. Newhall District's water supply assessment concluded that water delivery under the State Water Project would be 50 percent of the entitlement 80 percent of the time.

—Even without the 41,000 AFY that is subject to litigation, Castaic "retains reliable entitlement to 54,200 AFY, which exceeds [Castaic's] demand for [State Water Project] water by 18,844 AFY." (As noted above, the area's 2001 demand for water (76,769 acre-feet) was met with local groundwater plus 35,356 acre-feet of Project water (65 percent of its 54,200 acre-feet entitlement, or 37 percent of its 95,200 acre-feet entitlement).) Thus, the demand created by the project (386 AFY) "will be well within the current entitlement even without the 41,000 AFY."

—*PCL* and *Friends I* are "fully discussed in the EIR." Although the EIR's in those cases were invalidated, the underlying agreement to transfer the 41,000 AFY entitlement to Castaic was not enjoined, and the disputed water "is in fact currently available to" Castaic and is being used.

The trial court also observed that perchlorate contamination was "discussed extensively in the EIR" (citing the evidence submitted by SCOPE, plus the City's one-paragraph response), and that Newhall District's water supply assessment acknowledged the concern about perchlorate, but nonetheless did not conclude that supplies would be insufficient.

G. *Analysis and conclusion: The EIR did not adequately inform the public about uncertainties in the water supply.*

SCOPE asserts that the trial court's finding that the EIR's water supply analysis was adequate is based on several legal errors. We agree in part, and treat SCOPE's claims in turn.

1. *The EIR's treatment of Castaic's 41,000 AFY entitlement was inadequate.*

SCOPE's primary challenge to the adequacy of the EIR's analysis of the water supply is that the City, without analysis or discussion, relied on Castaic's 41,000 AFY entitlement to State Water Project water—43 percent of its total Project entitlement—despite the fact that the EIR for Castaic's purchase of the entitlement was decertified in *Friends I, supra,* 95 Cal.App.4th 1373. Gate King, on the other hand, contends the EIR's discussion of water supply was legally adequate, including its discussion of the uncertainties related to the 41,000 AFY transfer. According to Gate King, the EIR "directly addresses" this issue, acknowledges the uncertainty, "but concludes that it is likely that the 41,000 AFY will continue to be available."

We are compelled to agree with SCOPE. Contrary to Gate King's assertion, the EIR does not "directly address" the issue, which arose when *Friends I* was decided in January 2002, contemporaneously with circulation of the draft EIR. The final EIR contains an inadequate discussion—in fact, no discussion at all—of the uncertainty surrounding the transfer of the 41,000 AFY entitlement. The text of the EIR does not mention the decertification of the EIR for the Castaic purchase, and does not discuss the fact that entitlements are not really entitlements, but only "paper" water. (*PCL, supra,* 83 Cal.App.4th at p. 908, fn. 5 ["the state cannot deliver 4.23 [million acre-feet] of water annually"; entitlements "represent nothing more than hopes, expectations, water futures or . . . 'paper water' "]; *Friends I, supra,* 95 Cal.App.4th at p. 1376 ["[t]he reliability of delivery is approximately 50 percent of entitlements"].) The EIR merely states, in an analysis unchanged from the draft, that Castaic's entitlement "can fluctuate from year to year based on a number of factors . . . ." When SCOPE's comments pointed out that the City failed to review or comply with the findings in *PCL* and *Friends I,* and should not rely on full entitlements to State Water Project water, the City's response provided no analysis of the point, and no mention of the magnitude of the Castaic purchase. The City simply stated that the Newhall District's water supply assessment concluded that the Gate-King project's water demand was included in the UWMP 2000, and that water supplies "could potentially be limited by three ongoing legal challenges" described in the District's water supply assessment. As mentioned, the assessment merely stated that: (1) Castaic's entitlements totaled 95,200 AFY, the availability of which was estimated to be delivery of 50 percent of the entitlement 80 percent of the time; (2) "[a] portion" of the entitlements was derived from the Monterey Agreement; (3) the Monterey Agreement was subject to further environmental assessment by the Department of Water Resources; (4) the Castaic EIR, which was tiered on the Monterey Agreement, was under appellate court review; and (5) the adequacy of the UWMP 2000 was being challenged in the trial court.

■ We cannot agree that the City's response "directly addresses" the uncertainty created by the decertification of the EIR for the Castaic purchase. It also does not conclude, as Gate King contends, that "it is likely that the 41,000 AFY will continue to be available." The City's response to SCOPE's comments is completely devoid of any direct discussion of the 41,000 AFY, as is the Newhall District's water supply assessment on which the City relies. The adequacy of supply absent the 41,000 AFY entitlement is not discussed, and the means of meeting the demand for water in the absence of the 41,000 AFY entitlement is not analyzed. We can only assume the City "conclude[d] that it is likely that the 41,000 AFY will continue to be available," because the point is not discussed. Such an assumption, however, is impermissible, as it is antithetical to the purpose of an EIR, which is to reveal to the public "the basis on which its responsible officials either approve or reject environmentally significant action," so that the public, "being duly informed, can respond accordingly to action with which it disagrees." (*Laurel Heights, supra*, 47 Cal.3d at p. 392.) As another court observed, "[t]o be adequate, the EIR must include sufficient detail to enable those who did not participate in its preparation to understand and 'meaningfully' consider the issues raised by the proposed project." (*SCOPE, supra*, 106 Cal.App.4th at p. 721; see also *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029] (*Concerned Citizens*) ["[t]o facilitate CEQA's informational role, the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions"].) This standard is not met in the absence of a forthright discussion of a significant factor that could affect water supplies. The EIR is devoid of any such discussion.

■ Gate King points out that while the EIR for Castaic's purchase of the 41,000 AFY entitlement was invalidated, the *Friends I* court did not set aside the contract or otherwise affect Castaic's actual use of the disputed 41,000 AFY entitlement, pending preparation of a new EIR. The reality of the water supply situation in the Santa Clarita Valley, Gate King says, is that the 41,000 AFY has been transferred, is available for use, and is being used, despite the decertification of the EIR. Gate King is correct on the facts, but is mistaken as to their import. While the "reality" is that water under the entitlement is being used,[15] the question is whether the entitlement should be used for purposes of planning future development, since its prospective availability is

---

[15] On remand of *Friends I* to the trial court, Castaic submitted the declaration of Dan Masnada, its general manager, urging the court not to set aside the transfer of the 41,000 AFY entitlement. SCOPE included the Masnada declaration, dated September 12, 2002, with its comments in this case. Masnada stated that if the water purveyors in the Santa Clarita Valley had been unable to rely on the 41,000 AFY entitlement, the valley would have experienced water shortages in 2001 and 2002; that the permanent loss of the 41,000 AFY entitlement would have "an immediate and devastating impact on [Castaic's] ability to deliver requested water supplies to the Retail Purveyors;" and that the 41,000 AFY entitlement "is needed to

legally uncertain. Although this decision must be made by the City, the EIR is intended to serve as an informative document to make government action transparent. Transparency is impossible without a clear and complete explanation of the circumstances surrounding the reliability of the water supply.[16]

This case bears a number of similarities to *SCOPE, supra,* 106 Cal.App.4th 715, which found that the water services portion of the EIR was inadequate: "Here the draft EIR gives no hint that [State Water Project] entitlements cannot be taken at face value. It is only in response to comments and submissions by project opponents such as SCOPE that the EIR obliquely acknowledges that the entitlements may not be all they seem. Instead of undertaking a serious and detailed analysis of [State Water Project] supplies, the EIR does little more than dismiss project opponents' concerns about water supply. Water is too important to receive such cursory treatment." (*SCOPE, supra,* 106 Cal.App.4th at p. 723.) The circumstances in this case are strikingly similar to those in *SCOPE,* so far as the 41,000 AFY entitlement is concerned. The draft EIR gave "no hint" that State Water Project entitlements cannot be taken at face value. (*Ibid.*) When SCOPE pointed this out in its comments, the City did "little more than dismiss project opponents' concerns about water supply." (*Ibid.*) The City merely (1) referred to the Newhall District's water supply assessment, which said Castaic's entitlements totaled 95,200 AFY, with availability of water under the entitlements projected at 50 percent of the entitlement 80 percent of the time; and (2) stated that water supplies "could potentially be limited" by three ongoing legal challenges, which were mentioned but not discussed. Without a discussion of the nature of the limitations, in particular the 41,000 AFY, it is impossible to know the contours of the potential limitation on the water supplies.

---

meet demand of current users," and "[a]pproved development merely exacerbates the water shortage."

[16] Gate King contends that there is "simply no reason to believe that the transfer will be reversed," and that "it must be presumed" that Castaic "will eventually be able to prepare an adequate EIR." According to Gate King, to argue that Castaic should not be allowed to rely on the 41,000 AFY for planning purposes gives greater weight to a theoretical possibility than to an environmental reality, "turning CEQA on its head." We are inclined to agree with SCOPE that it is Gate King which turns CEQA on its head with its argument, which suggests that the environmental review of the 41,000 AFY transfer is "an exercise in futility because the preordained outcome of the process is continued use of the 41,000." We note the *Friends I* trial court, in refusing to enjoin Castaic's use of the 41,000 AFY, found petitioner's contention that the water would be used to approve new development was "speculative at this time," but stated that the petitioner could renew its application to prohibit Castaic from using the water for development "based upon evidence of the actual use of such additional water for purposes it considers improper."

We recognize that Appendix K to the final EIR acknowledges that "the availability of the 41,000 AFY . . . is not absolutely established" because the EIR prepared for its transfer was invalidated. Further, Appendix K states that the "primary uncertainty" with respect to the local water supply is the availability of the 41,000 AFY entitlement. Indeed, Appendix K states that if the 41,000 AFY is not available, "water supplies may be insufficient to meet the projected increase in demand through 2020." However, Appendix K is too little and too late, for multiple reasons.

■ As stated in *SCOPE,* information "scattered here and there in EIR appendices," or a report "buried in an appendix," is not a substitute for "a good faith reasoned analysis in response." (*SCOPE, supra,* 106 Cal.App.4th at pp. 722, 723.) We are troubled by the fact that the only discussion in the EIR of the uncertainty created by the decertification of the EIR for the Castaic purchase appears in an appendix added to the final EIR shortly before certification. The seriousness of water supply issues, as reflected in SCOPE's comments, merits discussion in the text of the EIR, where it is most readily accessible. At a minimum, the text of the EIR should refer to the appendices that contain the relevant discussion. Nonetheless, if Appendix K's discussion were adequate, we might overlook the fact it is relegated to an appendix that is not mentioned in the text of the EIR. But the discussion is not adequate.

■ Appendix K does little more than acknowledge that, without the 41,000 AFY entitlement, water supplies may be insufficient. However, as stated in *SCOPE,* "[t]he final EIR's acknowledgement that there 'could be a deficit of supply' does not cure the defect"[17] (*SCOPE, supra,* 106 Cal.App.4th at p. 723), as no discussion exists from which to judge the likelihood of the deficit or alternate sources of supply to meet such a deficit. The EIR "must contain facts and analysis, not just the agency's bare conclusions or opinions." (*Concerned Citizens, supra,* 42 Cal.3d at p. 935.) Moreover, the very next sentence of Appendix K contains the misleading statement that, even without the 41,000 AFY, Castaic retains an entitlement (54,200) that exceeds Castaic's 2001 demand for State Water Project water by 18,844 acre-feet, so that the project's demand of 386 AFY "would be well within the current entitlement." Appendix K fails to add, however, that the actual availability of the entitlement is estimated at "50% of the entitlement 80% of the time," a condition that would have resulted in a deficit, not a surplus, of supply in 2001 in the absence of the 41,000 AFY entitlement. (See discussion in pt. II.G.2., *post.*)

---

[17] The court continued: "Without some reasonably accurate estimate of [State Water Project's] ability to deliver water, it is impossible to judge how likely or how deep the deficit might be." (*SCOPE, supra,* 106 Cal.App.4th at p. 723.)

██ In short, neither the text of the EIR nor its appendices contain a proper analysis of the impact of the availability *vel non* of the 41,000 AFY. As in *SCOPE,* "[w]ithout such information, the general public and its responsible officials cannot make an informed decision on whether to approve the project." (*SCOPE, supra,* 106 Cal.App.4th at p. 724.) Consequently, the final EIR fails in its function as an informational document on the water issues.

██ Gate King insists there was substantial evidence of adequate water supplies, pointing to the Newhall District water supply assessment, and to the fact that the UWMP 2000 projections were based on reduced entitlements, namely 59.7 percent in average/normal years and 39.8 percent in dry years. This evidence, however, does not address the point in dispute—the use of the disputed 41,000 AFY as part of the base upon which to calculate reduced entitlements. Gate King also points to other documents in the administrative record: the UWMP 2000, the Newhall District's 2001 Masterplan, and the 2001 and 2002 Santa Clarita Valley Water Reports. Of these documents, only the last two documents report the *Friends I* decision invalidating the EIR for the 41,000 AFY entitlement. Moreover, while these documents are contained in the administrative record, they are not found in the EIR. (See *SCOPE, supra,* 106 Cal.App.4th at p. 723 ["[i]t is not enough for the EIR simply to contain information submitted by the public and experts. Problems raised by the public and responsible experts require a good faith reasoned analysis in response"; "[t]he requirement of a detailed analysis in response ensures that stubborn problems or serious criticism are not 'swept under the rug' "].)

Finally, at oral argument Gate King observed that, even if the 41,000 AFY entitlement were discontinued, contingency plans exist for alternative sources of water, such as short-term water exchanges, desalination, and additional groundwater pumping. The EIR, however, does not analyze or quantify these alternative sources in connection with the uncertainty of the 41,000 AFY entitlement. In the text of the EIR, these sources are mentioned, in a description of Castaic's capital improvement program, as funded activities "to achieve water supply reliability . . . ." (See fn. 8, *ante.*) Similarly, Appendix K observes that, to the extent projected water supplies may be insufficient to meet demand, Castaic's long-term capital improvement program includes funding to provide for such activities over time. Appendix K's discussion of the adequacy of the water supply without the 41,000 AFY entitlement, however, merely observes that "the UWMP identifies several additional sources of water (water recycling, purchase of additional [State Water Project] supplies, desalination) that are expected to meet water demand projections over time." These generalities, without details or estimates con-

cerning the amount of water the programs might make available, are not a proper substitute for a discussion which allows "those who did not participate in [the EIR's] preparation to understand and 'meaningfully' consider" the issue at hand. (*SCOPE, supra,* 106 Cal.App.4th at p. 721.)

In sum, no analysis was provided of the adequacy of the water supply in light of the uncertainty flowing from the decertification of the EIR for the Castaic purchase. This absence of discussion and analysis undermines the informational function of the EIR for the Gate-King project and requires its decertification.

> 2. *The record does not otherwise demonstrate the adequacy of water supplies without the 41,000 AFY entitlement.*

In a related argument Gate King contends, and the trial court concluded, that even without the 41,000 AFY entitlement, the record showed sufficient water supplies. Gate King reasons that Castaic retains an entitlement to 54,200 AFY; Castaic used 35,356 acre-feet of State Water Project water in 2001 to meet the total water demand of 76,769 acre-feet; and Appendix K states that "[b]ecause this amount [54,200] exceeds 2001 [Castaic] demand for [State Water Project] water by 18,844 AF, the 386 AFY increase in water demand associated with the proposed project would be well within the current entitlement." This argument is flawed because it relies on paper water, and assumes that the entitlement to 54,200 AFY is identical to actual delivery of 54,200 AFY. The EIR—in the City's response to SCOPE's comments—states that water supply availability under Castaic's entitlements is estimated to be "delivery of 50% of the entitlement 80% of the time." Accordingly, Castaic cannot count on 54,200 AFY of State Water Project water. Without its 41,000 AFY entitlement, Castaic can reliably count on only 50 percent of 54,200, or 27,100 AFY. Since 2001 demand for State Water Project water was 35,356, there is plainly no surplus upon which to rely, absent the 41,000 AFY transfer.

Gate King argues that SCOPE's "mind-numbing calculations" of paper water versus actual water ignore "the most reliable indicator" of the volume of water the State Water Project will deliver, namely, the amount delivered in the past. In 2002, this figure was 41,768 acre-feet, "not the theoretical 27,100 AF posited by" SCOPE.[18] This argument assumes the very point at issue, since Castaic's 2002 water delivery was based on the full 95,200 AFY entitlement, and it ignores the EIR's own statement that delivery of

---

[18] The 41,768 acre-feet figure for 2002 appears in the 2002 Santa Clarita Valley Water Report, prepared in April 2003. The report also shows total water demand at 85,031 acre-feet in 2002.

entitlements is estimated to be 50 percent of the entitlement 80 percent of the time.[19]

In sum, without the 41,000 AFY entitlement, substantial evidence of sufficient water supplies simply does not exist. Accordingly, the EIR's failure to present a "reasoned analysis in response" to SCOPE's comments—that is, an analysis of how demand for water would be met without the 41,000 AFY entitlement, or of why it is appropriate to rely on the 41,000 transfer in any event—renders the EIR defective as an informational document upon which the public and its officials can rely in making informed judgments. (*SCOPE, supra,* 106 Cal.App.4th at p. 723.)

### 3. *The EIR's treatment of the perchlorate contamination issue was adequate.*

SCOPE also contends the trial court erred when it upheld the final EIR's analysis of perchlorate contamination in the Saugus Formation. It claims the EIR is inadequate because it does not attempt to quantify the impact of the contamination on the availability of groundwater from the Saugus Formation, and does not analyze the extent of the contamination, the rate at which it is advancing, the status of potential remediation measures, or the timeline for their implementation. On this point, we disagree with SCOPE, although the point is effectively moot in light of our conclusion that the water supply analysis is otherwise defective.

The draft EIR did not mention perchlorate contamination. However, it relied upon UWMP 2000's projections of water supply and usage. UWMP 2000 identified the discovery of perchlorate in Southern California as a water quality problem that could affect groundwater supply availability, stated that perchlorate can be treated and removed from groundwater, and mentioned two possible treatment programs. UWMP 2000 concluded: "The few wells affected have been shut down, effective treatment technologies have been developed, and a plan is being worked out to remove the contamination from the groundwater." SCOPE's comments on the draft EIR asserted the Saugus Formation could not be relied on until it is remediated, and observed that the UWMP 2000 was in litigation "due to its overstatement of water supply and understatement of demand." SCOPE also submitted expert testimony, reports and memoranda which extensively discussed the contamination.

---

[19] Castaic's receipt of 41,768 acre-feet was 44 percent of the full entitlement of 95,200. Had Castaic been unable to rely on the 41,000 AFY entitlement, and received 44 percent of its reliable entitlement of 54,200, it would have received only 23,848 acre-feet of State Water Project water.

The City's response acknowledged that perchlorate has been a concern since its discovery in 1997, and stated that operation of the four contaminated wells was suspended, testing for perchlorate was continuing in all active wells, and treatment technologies were currently available. SCOPE asserts its evidence was ignored, but we are unable to make that assumption. The function of the EIR is to inform and, by virtue of SCOPE's evidence and the UWMP 2000, the City and the public were fully informed. While we may not agree with the City's decision to rely on the conclusions in the UWMP 2000 rather than the conclusions flowing from SCOPE's evidence, this court's inquiry extends only to the EIR's sufficiency as an informative document, not to the correctness of its environmental conclusions. (*Laurel Heights, supra,* 47 Cal.3d at p. 392.)

SCOPE points out that Castaic's UWMP 2000 was recently invalidated by the Court of Appeal in *Friends II, supra,* 123 Cal.App.4th at pages 14–15, and suggests that we remand the case to the City for a reevaluation of its analysis. SCOPE is mistaken. It is well-established that once a project is approved, new information does not require reopening the approval. (*SCOPE, supra,* 106 Cal.App.4th at p. 723; Cal. Code Regs., tit. 14, § 15162, subd. (c).) Gate King is thus correct that it is "simply too late to raise this [the invalidation of the UWMP 2000] as an issue."

Gate King's victory on the issue of perchlorate contamination, however, is pyrrhic. Our decision to decertify the EIR, based on inadequate consideration of the water supply issues previously discussed, inevitably has the practical effect of requiring the City to come to grips with the perchlorate issue as well, because reliance on groundwater supplies will acquire additional significance if less imported water is available. And, while the City properly relied on UWMP 2000 conclusions on perchlorate contamination in its previous analysis, it will be unable to do so in any new analysis because of the invalidation of UWMP 2000 in *Friends II.* (*Friends II, supra,* 123 Cal.App.4th at pp. 14–15 [describing the UWMP 2000 as "fatally flawed" and concluding that its description of the reliability of the groundwater supplied from the Saugus Formation and Alluvial Aquifer was inadequate because of failure to address timing issues related to the perchlorate contamination].)[20]

---

[20] In *Friends II, supra,* 123 Cal.App.4th 1, the court held that the UWMP 2000 failed to comply with statutory requirements for preparation of an urban water management plan. The court found the UWMP 2000's description of the reliability of the groundwater supplied from the Saugus Formation and Alluvial Aquifer was inadequate under Water Code section 10631, subdivision (c), because it failed to address timing issues related to the perchlorate contamination discovered in Saugus Formation groundwater. While the UWMP 2000 mentioned that a groundwater cleanup plan was being developed, it did not mention the stage of development that had been reached or the date when the plan could be completed and implemented. (*Friends II, supra,* 123 Cal.App.4th at p. 12.) Nor did the UWMP state how fast the

III., IV.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. CONCLUSION

While no other defects in the EIR are found, the section discussing water supplies is inadequate. Specifically, the EIR failed to present a reasoned analysis in response to SCOPE's comments pointing out the uncertainty attending the City's reliance on Castaic's entitlement to 41,000 AFY of imported water purchased under the Monterey Agreement. Without the 41,000 AFY entitlement, substantial evidence of sufficient water supplies does not exist. Yet neither the text of the EIR nor its appendices present a reasoned analysis of the significance *vel non* of the decertification of the EIR for the Castaic purchase; how demand for water would be met without the 41,000 AFY entitlement; or why it is appropriate to rely on the 41,000 AFY transfer in any event. The absence of this analysis renders the EIR defective as an informational document upon which the public and its officials can rely in making informed judgments. An analysis of these points should, in our view, appear in the text of the EIR. However, if the analysis is to appear in an appendix, the EIR text should contain a summary of the salient points of the appendix and a specific reference to it.

As for the issue of perchlorate contamination, the City and the public were fully informed by virtue of SCOPE's evidence and the UWMP 2000. However, our decision to decertify the EIR based on inadequate consideration of the imported water issues will necessarily require a renewed consideration of groundwater supplies, and the City will be unable to rely on UWMP 2000 conclusions on perchlorate contamination because of the invalidation of UWMP 2000 in *Friends II, supra*, 123 Cal.App.4th 1.

---

perchlorate contamination was spreading, or how any uncertainty on timing issues affects the reliability of the supply of groundwater. (*Id.* at p. 13.) The court observed that "[t]he public and the various governmental entities that rely on the UWMP may be seriously misled by it and, if the wrong set of circumstances occur [e.g., prolonged drought, increased reliance on groundwater from the Saugus Formation, accelerated spread of the perchlorate contamination within the formation], the consequences to those who relied on the UWMP, as well as those who share a water supply with them, could be severe." (*Id.* at p. 15, fn. omitted.)

[*]See footnote, *ante*, page 1219.

## DISPOSITION

Because the water supplies portion of the EIR is inadequate, the judgment is reversed. The trial court is directed to issue a writ of mandate vacating the certification of the EIR and to retain jurisdiction until the City certifies an EIR complying with CEQA consistent with the views expressed in this opinion. Costs on appeal are awarded to appellants.

Cooper, P. J., and Rubin, J., concurred.

A petition for a rehearing was denied November 22, 2005.