[No. B145283. Second Dist., Div. Four. Jan. 10, 2002.]

FRIENDS OF THE SANTA CLARA RIVER, Plaintiff and Appellant, v. CASTAIC LAKE WATER AGENCY, Defendant and Respondent.

1374

**COUNSEL**

Brandt-Hawley & Zoia and Susan Brandt-Hawley for Plaintiff and Appellant.

Robert H. Clark; Kane, Ballmer & Berkman and R. Bruce Tepper, Jr., for Defendant and Respondent.

## OPINION

## VOGEL (C. S.), P. J.—

### INTRODUCTION

In 1995, the California State Department of Water Resources (DWR) and water contractors of the State Water Project (SWP) reached a historic agreement, known as the Monterey Agreement, changing the allocations between agricultural and urban contractors of entitlements to SWP water. A major component of the Monterey Agreement was the transfer of entitlements up to 130,000 acre-feet per year from agricultural contractors to urban contractors, on a willing buyer-willing seller basis. Pursuant to the Monterey Agreement, respondent Castaic Lake Water Agency (respondent) purchased from the Kern County Water Agency (KCWA) and its member district the Wheeler Ridge-Maricopa Water Storage District (WRMWSD) entitlement to 41,000 acre-feet per year of SWP water.

Respondent approved this transfer after certifying a project environmental impact report (EIR) pursuant to the California Environmental Quality Act (CEQA), Public Resources Code section 21000 et seq.[1] In the present case appellant Friends of the Santa Clara River (appellant), a nonprofit California corporation, challenges the sufficiency of respondent's EIR.

Previously, the Central Coast Water Authority (CCWA) as lead agency prepared an EIR on the environmental effects statewide of implementing the Monterey Agreement (the Monterey Agreement EIR). Then the Belridge Water Storage District, one of the member districts of KCWA, as lead agency prepared an EIR on the environmental effects in Kern County of selling up to 130,000 acre-feet of SWP entitlements to then unidentified purchasers (the Belridge EIR). Then respondent's EIR "tiered" on the Monterey Agreement EIR and the Belridge EIR.

Appellant unsuccessfully petitioned the trial court in the present case for a writ of mandate compelling respondent to set aside the certification of respondent's EIR and approval of this project, on various grounds of alleged failure to comply with CEQA. Appellant appealed the judgment denying its petition for a writ of mandate.

While the present appeal was pending, the Court of Appeal for the Third Appellate District found the Monterey Agreement EIR inadequate and ordered it decertified. (*Planning & Conservation League v. Department of*

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated. All references to "Guidelines" are to the CEQA regulations in title 14, California Code of Regulations.

*Water Resources* (2000) 83 Cal.App.4th 892 [100 Cal.Rptr.2d 173], review den. Dec. 13, 2000, hereafter cited as *PCL.*) We conclude this requires decertifying respondent's tiered EIR.

FACTUAL AND PROCEDURAL BACKGROUND

*The Monterey Agreement*

The SWP was constructed in the 1960's. It is a complex system of reservoirs, dams, power plants, pumping plants, canals, and aqueducts for storage and delivery of water. DWR manages the SWP. DWR has contracts with water contractors to deliver water to the contractors. Each such contract sets forth a maximum annual entitlement. DWR has historically delivered less water than the entitlements. The reliability of delivery is approximately 50 percent of entitlements.

Before the Monterey Agreement, shortfalls in deliveries due to prolonged droughts and other factors led to friction among the contractors over obtaining the available SWP water. Urban and agricultural contractors each believed the other was receiving preferential treatment. This friction was exacerbated by a provision in the SWP contracts that in years when shortfalls occurred, required agricultural contractors to incur the first delivery cutbacks.[2] Because contractors pay certain fixed costs to finance the SWP regardless of actual deliveries, agricultural contractors suffered severe delivery reductions with little relief from their financial obligations. Litigation was threatened. DWR, agricultural and urban water contractors met and negotiated the Monterey Agreement to avoid litigation and to increase the reliability of supply to all contractors. (*PCL, supra,* 83 Cal.App.4th at pp. 901-902.)

Under the Monterey Agreement, all future allocations of SWP water are based on entitlements; when supply is insufficient to meet requests, deliveries to all contractors will be reduced in proportion to their entitlements; no longer will agricultural contractors be required to absorb the first reductions. This increases the reliability of supply to agricultural contractors.

Inferably in return, under the Monterey Agreement, agricultural contractors "will make available for permanent transfer to Urban Contractors on a willing buyer-willing seller basis 130,000 acre-feet of annual entitlements,

---

[2] Under article 18(a) of then existing contracts, deliveries to agricultural contractors were reduced by 50 percent in any one year or a total of 100 percent in seven consecutive years, before deliveries were reduced to other contractors. (*PCL, supra,* 83 Cal.App.4th at p. 899.)

with [KCWA] being responsible for any portion of this amount not made available by other Ag Contractors." This will allow urban contractors to obtain additional entitlements, thereby slightly increasing their overall deliveries even in times of shortage.

In addition, the Kern Fan Element, a property acquired by DWR for water banking, will be transferred to agricultural contractors, 45,000 acre-feet of agricultural contractors' entitlements will be retired, and various operational changes will be made to improve efficiency and flexibility of the system.

### The Monterey Agreement EIR

The parties to the Monterey Agreement determined that its implementation could have potential environmental consequences and therefore an EIR was required. They designated CCWA, one of the SWP contractors, as lead agency to prepare the Monterey Agreement EIR. CCWA prepared the draft and final EIR's on implementation of the Monterey Agreement in May and October 1995.

The introduction to the draft Monterey Agreement EIR stated it is a "program" EIR. Reiterating the criteria for a program EIR found in Guideline section 15168, it stated: "The purpose of a Program EIR is to document a series of actions so related that they can be characterized as one project. The actions may be related in one or more of the following ways: by geographical proximity; as logical parts in a chain of contemplated actions; in connection with the issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program; or as individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects that can be mitigated in similar ways. The proposal to implement the Monterey Agreement fulfills both the second and third criteria above, i.e., logical parts in a chain of contemplated actions, and a series of actions related to the issuance of rules, regulations, plans, and other general criteria to govern the conduct of a continuing program." Again reiterating matter in Guideline 15168, it stated the advantages of a program EIR are that it may: "provide an occasion for a more exhaustive consideration of effects and alternatives than would be practical in an EIR on an individual action; ensure consideration of cumulative actions that might be slighted in a case-by-case analysis; avoid duplicative reconsideration of basic policy considerations; allow the Lead Agency to consider broad policy alternatives and program-wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts; and allow reduction in paperwork."

The Monterey Agreement EIR identified five major components of the Monterey Agreement with potential environmental effects: (1) revision of the methodology used to allocate water among contractors, (2) retirement of 45,000 acre-feet of agricultural entitlement, (3) transfer by sale between willing sellers and willing buyers of 130,000 acre-feet of entitlements from agricultural to urban contractors, (4) changes in the Kern Fan Element of the Kern Water Bank, and (5) changes in the manner Castaic Lake and Lake Perris terminal reservoirs may be operated. In general, the Monterey Agreement EIR determined the environmental effects that were capable of quantification at that time were negligible.

With regard to the change in the method of allocating entitlements, it summarized, "Changes in the method of allocating water become relevant only in years when demand exceeds available supply. During such years, following enactment of the principles contained in the Monterey Agreement, shortages will be shared proportionately by all contractors rather than be borne primarily by Agricultural Contractors as is the current practice. Thus, during future deficit years Agricultural Contractors can anticipate larger deliveries of water and Urban Contractors can expect smaller quantities of water than would have been the case in the past. These changes bring about a decrease in the variability of supplies delivered to Agricultural Contractors while increasing slightly that for the Urban Contractors. [¶] Added reliability of deliveries to Agricultural Contractors could increase the continuity of agricultural activities in these service areas. Added variability of water deliveries to Urban Contractors can, however, be offset by their acquisition of additional entitlement offered for sale by Agricultural Contractors as outlined below, and through other measures included in the program for increased water management flexibility."

With regard to the transfers of entitlements, it summarized: "The transfer of 130,000 AF of water entitlement from Agricultural Contractors to Urban Contractors and non-SWP Contractors has the potential to affect activities and land use patterns in those jurisdictions both relinquishing and acquiring the entitlement. Effects in those areas relinquishing water entitlement are likely to be centered on agricultural practices while those in areas acquiring water entitlement may relate to growth accommodation. The location of the eventual sellers and buyers of water entitlements is not known at this time." "SWP operations would not be adversely affected by the shift in deliveries among Contractors."

*Belridge EIR*

In contemplation of the transfer of up to 130,000 acre-feet of SWP entitlements from KCWA pursuant to the Monterey Agreement, the Belridge

Water Storage District as lead agency prepared a draft and final EIR in April and June of 1998 evaluating the effects in Kern County of such transfers. It evaluated the effects on the Belridge Water Storage District, the Lost Hills Water District, and the WRMWSD (all member districts of KCWA) of their transfer of SWP entitlements to yet undetermined purchasers.

The Belridge EIR repeatedly described the project being studied as a transfer of up to 130,000 acre-feet of entitlements *under the Monterey Agreement.* It stated: "The entitlement transfer would occur under the Monterey Agreement. . . . The benefits and impacts of the Monterey Agreement were evaluated in a separate environmental impact report [the Monterey Agreement EIR] which is discussed below and incorporated into this report by reference. However, to understand the potential benefits and impacts of the entitlement transfer, conditions that existed prior to the Monterey Agreement and after the Monterey Agreement are discussed."

The Belridge EIR then summarized how deliveries of SWP water differ before and after the Monterey Agreement. It also summarized in detail the Monterey Agreement EIR, which it incorporated by reference.

The Belridge EIR repeatedly stressed that under the changes made by the Monterey Agreement in allocating water during periods of shortage, agricultural contractors would not disproportionately suffer reduced deliveries, and therefore would enjoy increased reliability of deliveries even in times of shortage.

These assumptions enabled the Belridge EIR to conclude that the transfer of up to 130,000 acre-feet of entitlements from the member districts would not adversely affect at all the irrigated agricultural lands therein, because relinquishment of the entitlements would be compensated, on an average annual basis, by the increased reliability of SWP deliveries pursuant to the Monterey Agreement.

### Respondent's EIR

The EIR in dispute in the present case is the EIR prepared by respondent in February 1999 on the proposed transfer to respondent of 41,000 acre-feet per year of SWP entitlement from KCWA and its member district WRMWSD.

The introduction section of respondent's EIR expressly stated, *"This EIR is a Project EIR that tiers from"* (1) a prior 1988 EIR by respondent, "Capital Program and Water Plan Including Acquisition of Supplemental Water and

of a Proposed Second Plant Site", (2) the Monterey Agreement EIR, and (3) the Belridge EIR. It stated the proposed transfer "is an example of the individual projects envisioned in the Monterey Agreement and evaluated on a programmatic basis in the Monterey Agreement EIR."

This introduction stated that "As a result of the recently adopted Monterey Agreement, [respondent] has the opportunity to purchase additional SWP entitlement beyond its current entitlement. The opportunity to acquire additional entitlement under the terms of the Monterey Agreement disappears when the subject entitlement (130,000 AFY) is transferred to [respondent] or other entities. A summary of the Monterey Agreement is presented below, and a more complete discussion of the SWP is included in the Monterey Agreement FEIR." A separate section of the introduction described "the Monterey Agreement/Amendment and its anticipated effect on historic water deliveries." After summarizing the major provisions of the Monterey Agreement, it concluded, "The Monterey Agreement has three primary objectives: (1) to increase the reliability of all SWP Contractors' water supplies; (2) to stabilize the rate structure to improve the financial viability of the SWP; and (3) to increase water management flexibility for all SWP Contractors. A permanent transfer of agricultural entitlement to an area with urban development potential such as that analyzed in this document is one of the ways that these objectives are intended to be met."

Respondent's EIR also discussed the Belridge EIR. It stated, "An independent EIR evaluating the environmental impacts of the sale of SWP entitlement within Kern County was completed by Belridge Water Storage District in June 1998. Issues identified in that EIR are not evaluated further in this EIR. Appropriate sections of the Belridge EIR . . . are incorporated herein." It added that the proposed transfer would not significantly decrease water deliveries or irrigated acreage within KCWA or WRMWSD because, with implementation of the Monterey Agreement, "SWP deliveries to agricultural users will not be subject to absorbing the initial deficiencies during droughts and other unreliable delivery scenarios." The project description section acknowledged that this proposed transfer, "assuming it proceeds under the Monterey Agreement, will fulfill part of [KCWA's] commitment [under the Monterey Agreement to transfer up to 130,000 acre feet of entitlements to urban contractors]."

A commenter on respondent's draft EIR, Santa Clarita Organization for Planning the Environment, commented that the draft EIR was deficient in failing to analyze impacts on land in Kern County or on Castaic Lake as a terminal reservoir of the SWP. Respondent responded that those impacts had

already been evaluated in the Belridge EIR and the Monterey Agreement EIR and therefore were not required to be addressed in respondent's EIR.

Despite these numerous references relying on the Monterey Agreement and the Monterey Agreement EIR, respondent's EIR also asserted the proposed transfer of SWP entitlements could take place without the Monterey Agreement, under pre-Monterey Agreement contract law, with the consent of all parties and DWR. It acknowledged that the Monterey Agreement EIR was challenged in the *PCL* case, had been upheld by the Sacramento Superior Court, but was still challenged in the appeal then pending.

A comment from the Environmental Defense Center on the proposed final EIR complained that the EIR expressly tiers on the Monterey Agreement EIR, the status of which was questionable because it was in litigation in the Court of Appeal for the Third Appellate District; it also asserted the Belridge EIR was inappropriate for tiering. Respondent's consultant replied, "The proposed FEIR identifies that the proposed project may proceed either under the provisions of the Monterey Agreement or under the terms of the Kern County Water Agency Contract before it was modified by the Monterey Amendment . . . . The proposed final EIR identified the referenced litigation and Superior Court ruling . . . . [¶] The EIR does not tier from the Belridge . . . EIR but incorporates appropriate sections by reference. . . . The inclusion of the reference to the Belridge 1998 EIR [as having been tiered on, as distinguished from having been incorporated by reference] is an error."

On the present appeal respondent admits that its EIR tiers on the Monterey Agreement EIR. Respondent states its EIR incorporates by reference the Belridge EIR.

*Trial Proceedings in the Present Case*

Appellant Friends of Santa Clara River filed a petition for a writ of mandate compelling respondent to set aside respondent's certification of its EIR and approval of the project, primarily on the ground respondent failed to comply with CEQA. Appellant alleged various defects in the EIR and respondent's findings. The alleged defects did not involve the Monterey Agreement EIR or the then pending *PCL* appeal. The trial court denied appellant's petition, finding that the EIR was adequate and that appellant's other contentions lacked merit. Appellant appealed from the judgment denying the petition.

## The PCL Case

In September 2000, after the trial court's judgment in the present case, the Court of Appeal for the Third Appellate District held the Monterey Agreement EIR prepared by CCWA was inadequate. (*PCL, supra,* 83 Cal.App.4th 892.) The Court of Appeal found two major defects. (1) The DWR, not CCWA, should have prepared the report as the lead agency; DWR has a statewide perspective and expertise on how allocation of water to another part of the state has implications for distribution throughout the system. (83 Cal.App.4th at pp. 903-907.) (2) The EIR did not adequately address the alternative of "no project"; it should have addressed the environmental implications of invoking article 18(b) of existing contracts, under which entitlements would be permanently reduced to reflect actual delivery patterns. (83 Cal.App.4th at pp. 908-920.) The court commented, "Perhaps the deficiencies in the EIR relate to the provincial experience of the lead agency, a topic we addressed earlier. We conclude the EIR failed to meet the most important purpose of CEQA, to fully inform the decision makers and the public of the environmental impacts of the choices before them. A new EIR must, therefore, be drafted. [¶] In view of our earlier conclusion that DWR must serve as lead agency under CEQA, we need not, as we ordinarily would, address the other alleged deficiencies in this EIR. (Pub. Resources Code, § 21005, subd. (c).) We need not hypothesize on the remaining issues because DWR, with its expertise on the statewide impacts of water transfers, may choose to address those issues in a completely different and more comprehensive manner." (83 Cal.App.4th at p. 920.)

The Court of Appeal reversed the judgment of the Sacramento Superior Court and remanded with directions to "issue a writ of mandate vacating the certification of the EIR," to "consider such orders it deems appropriate under Public Resources Code section 21168.9, subdivision (a)" and to "retain jurisdiction over this action until DWR certifies an EIR in accordance with CEQA standards and procedures that meets the substantive requirements of CEQA." (*PCL, supra,* 83 Cal.App.4th at p. 926.) It noted, "We earlier declined to stay implementation of the Monterey amendments and transfer of the Kern Fan Element. Consequently, the project was permitted to proceed pending disposition of this appeal. The record does not reflect the current status of the project and, in the absence of such information, we shall issue no orders concerning further implementation of the project. The trial court, acting under the authority provided by Public Resources Code section 21168.9, is the more appropriate forum to consider and rule upon requests to enjoin all or portions of the project pending completion of administrative and judicial proceedings necessitated by our opinion." (*Id.* at p. 926, fn. 16.)

*Expanded Issue on This Appeal*

█ In its appellant's opening brief on the present appeal, appellant reasserted various arguments that appellant had unsuccessfully raised below concerning respondent's EIR and findings. Appellant's opening brief added, cursorily, that the decision in the *PCL* appeal, during pendency of this appeal, "completely shattered" respondent's EIR that was tiered on the EIR decertified in the *PCL* decision. Appellant more fully developed this argument in its appellant's reply brief. We requested and received supplemental briefs from the parties on this issue.

## LEGAL BACKGROUND: TIERING OF EIR'S

█ Tiering "means the coverage of general matters and environmental effects in an environmental impact report prepared for a policy, plan, program or ordinance followed by narrower or site-specific environmental impact reports which incorporate by reference the discussion in any prior environmental impact report and which concentrate on the environmental effects which (a) are capable of being mitigated, or (b) were not analyzed as significant effects on the environment in the prior environmental impact report." (§ 21068.5; Guidelines, §§ 15152, 15385.)

Tiering is favored by the Legislature to streamline the regulatory process and avoid wasteful duplication of effort. (*Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 197-198 [55 Cal.Rptr.2d 625]; §§ 21093, 21094; Guideline, § 15152, subd. (b).) "To achieve this purpose, environmental impact reports shall be tiered whenever feasible, as determined by the lead agency." (§ 21093, subd. (b).) "Where a prior environmental impact report has been prepared *and certified* for a program, plan, policy, or ordinance, the lead agency for a later project that meets the requirements of this section shall examine significant effects of the later project upon the environment by using a tiered environmental impact report . . . ." (§ 21094, subd. (a), italics added.) "All public agencies which propose to carry out or approve the later project may utilize the prior environmental impact report and the environmental impact report on the later project to fulfill the requirements of Section 21081 [which concerns findings necessary in order to approve a project if significant environmental effects have been identified]. [¶] When tiering is used pursuant to this section, an environmental impact report prepared for a later project shall refer to the prior environmental impact report and state where a copy of the prior environmental impact report may be examined." (§ 21094, subds. (d), (e).) "The later EIR . . . should state that the lead agency is using the tiering

concept and that it is being tiered with the earlier EIR." (Guideline, § 15152, subd. (g).)

DISCUSSION

 Respondent's EIR expressly tiered on the Monterey Agreement EIR. Section 21094, subdivision (a) authorizes tiering where the previous EIR was certified. As a result of the *PCL* decision, the Monterey Agreement EIR is no longer certified. Respondent's EIR therefore has a defect. The question presented for us is whether that error was prejudicial. (§ 21005, subd. (b).)

Respondent contends that although its EIR tiered on the Monterey Agreement EIR, it did not expressly or specifically incorporate any substantive analysis from specific portions of the Monterey Agreement EIR. But respondent's reliance on the Monterey Agreement EIR is implicit in the concept of tiering, even without express reference to portions of the prior EIR's analysis. The express statement that respondent's EIR tiers on the prior EIR may be treated as an admission that respondent relied upon and needed to rely upon the Monterey Agreement EIR. (Guideline, § 15152, subd. (g).)

Aside from a few cursory statements that the present transfer could legally be accomplished under pre-Monterey Agreement contracts, a point we discuss later, respondent's EIR repeatedly referenced this project's part of the overall scheme envisioned by the Monterey Agreement. It stated this EIR was a project EIR tiered on the Monterey Agreement EIR, and that the project may be viewed as one of the projects "evaluated on a programmatic basis in the Monterey Agreement EIR."

Respondent's EIR also expressly tiered on, or at least expressly incorporated and relied upon, the analysis in the Belridge EIR. Respondent's EIR acknowledged that the transfer would not affect irrigated lands in Kern County because of the increased reliability of deliveries to agricultural contractors under the Monterey Agreement, and that the present transfer would fulfill part of KCWA's commitment in the Monterey Agreement. The Belridge EIR, on which respondent relied, repeatedly stated that the potential transfers of up to 130,000 acre-feet would be made pursuant to the Monterey Agreement and would have no significant effect on the irrigated lands, due to the increased reliability of deliveries under the Monterey Agreement. Respondent's reliance on the Belridge EIR illustrates respondent's implied acknowledgement that the transfer in this case is part of an overall larger scheme, analyzed on a programmatic basis in the Monterey Agreement EIR. The *PCL* decision also emphasizes the importance of the statewide perspective in analyzing the implications of water entitlement transfers for the state

and SWP as a whole. We therefore find unpersuasive respondent's present argument that respondent did not rely on the Monterey Agreement EIR.

At oral argument respondent offered a variant of this contention. According to respondent: "the project" being analyzed in respondent's EIR was only the transfer of 41,000 acre-feet of entitlements from WRMWSD to respondent; respondent was only required, therefore, to analyze the environmental effects of that narrow project; respondent adequately evaluated the local environmental effects of the subject transfer; respondent was not *required* to analyze the effects of the transfer on irrigated lands in Kern County or on the SWP upstream from Kern County, and to any extent respondent relied on the Belridge EIR and Monterey Agreement EIR to do so, this was surplusage; therefore the tiering on the Monterey Agreement EIR was harmless and does not require setting aside respondent's EIR that was otherwise adequate, viewed as a stand-alone document evaluating the local environmental impacts of this specific project. Appellant answers that respondent was required to review "the whole of the project." (Guideline, § 15378, subd. (a) [" 'Project' means the whole of an action."].)

Respondent's argument is not persuasive. The purpose of an EIR is to inform the public and the decision makers of the environmental effects of a project. Implicit in respondent's argument is an innuendo the public and decision makers in respondent's service area do not care about the upstream effects of this project. But in any event, this case does not squarely present that issue. This is not a case where (1) respondent neglectfully failed or deliberately refused to evaluate "upstream" environmental effects and (2) appellant challenged such an EIR as inadequate based on its failure to review upstream effects. Rather, respondent's EIR assumed the public and decision makers would want to know (1) that this project implements the Monterey Agreement, the environmental effects of which were analyzed in the Monterey Agreement EIR and found to be negligible, and (2) that the environmental effects in Kern County were studied in the Belridge EIR and found to be insignificant because of the increased reliability of water deliveries to agricultural contractors under the Monterey Agreement. The *PCL* decision undermined those premises by decertifying the Monterey Agreement EIR.

Respondent next contends the tiering on the Monterey Agreement EIR was not crucial because respondent and KCWA could legally have accomplished the transfer of entitlements under SWP contract law existing prior to the Monterey Agreement. Respondent cites the following portions of its EIR: section 1.3 of the introduction stated, "The SWP entitlement transfer analyzed in this document may proceed either under the provisions of the

Monterey Amendment[3] to KCWA water supply agreement with the DWR (Contract), or under the provisions of KCWA's Contract before it was modified by the Monterey Amendment," and again, "The entitlement transfer that is the subject of this EIR is of the type that falls within the provisions of the Monterey Amendment. However, this water transfer could occur without the Monterey Amendment with the consent of all affected parties." The project description section included, "This water transfer is expected to be subject to the conditions of the Monterey Amendment, but is not necessarily dependent upon the Monterey Amendment. With the cooperation of the participating agencies and the California Department of Water Resources (DWR), the transfer could occur in the absence of the Monterey Amendment." Finally, in response to comments from the Environmental Defense Center that tiering on the Monterey Agreement EIR was questionable in light of the *PCL* litigation, respondent's consultant stated, "The proposed FEIR identifies that the proposed project may proceed either under the provisions of the Monterey Agreement or under the terms of the Kern County Water Agency Contract before it was modified by the Monterey Amendment."

These assertions are based on article 41, a standard provision of state water contracts, stating that "No assignment or transfer of this contract or any part hereof, rights hereunder, or interest herein by the Agency shall be valid unless and until it is approved by the State and made subject to such reasonable terms and conditions as the State may impose."

Respondent's argument is based on a straw man. The issue in this case is not the legal authority of KCWA to sell and of respondent to buy SWP water entitlements, but rather the adequacy of the evaluation of the environmental effects of doing so. The Belridge EIR evaluated those effects in Kern County pursuant to the Monterey Agreement, concluding that selling the entitlements would not have an effect on irrigated lands because, on average, it would be compensated by the increased reliability of deliveries to agricultural contractors under the Monterey Agreement. Neither the Monterey Agreement EIR, nor the Belridge EIR, nor respondent's EIR evaluated the environmental effects on the seller's irrigated lands of selling the entitlements under pre-Monterey-Agreement conditions, with agricultural contractors subject to the first and severest reductions in times of shortage.

Respondent contends this shortcoming is alleviated by the inclusion of discussions in the Belridge EIR and respondent's EIR of a "no project

---

[3]By the Monterey "Amendment" respondent's EIR meant amendment of the SWP contracts between DWR and the approving contractors, to implement the principles of the Monterey Agreement.

alternative." This is incorrect. The no project alternative in the Belridge EIR was: not selling the entitlements. The no project alternative in respondent's EIR was: not buying the entitlements. Neither addressed the environmental effects of transferring the entitlements without the protections for agricultural contractors in the Monterey Agreement.

We conclude respondent's tiering on the now decertified Monterey Agreement EIR was prejudicial error. The judgment must be reversed because the certification of respondent's EIR must be vacated, based on the *PCL*/tiering problem. The question arises whether we should address the *other* alleged defects that were litigated below and raised in appellant's opening brief. We asked the parties to address whether these issues were moot if the judgment were reversed based on the *PCL*/tiering problem. Both parties remind us of section 21005, subdivision (c), which provides, "It is further the intent of the Legislature that any court, which finds, or, in the process of reviewing a previous court finding, finds, that a public agency has taken an action without compliance with this division, shall specifically address each of the alleged grounds for noncompliance." A treatise states, "This language, which courts may not treat as mandatory, is apparently intended to avoid situations in which a court, presented with numerous theories as to why a respondent agency purportedly violated CEQA, chooses to issue a writ based solely on one or a handful of theories, leaving the parties to wonder whether or not the unaddressed theories had merit. In such situations, where the respondent agency must conduct a second CEQA process to cure the problems identified by the court, the agency often does not know whether to modify its environmental document (or findings) to address concerns raised by the petitioners but ignored by the court." (Remy et al., Guide to the California Environmental Quality Act (10th ed. 1999) Judicial Review, pp. 646-647.)

Section 21005, subdivision (c) thus requires only that *if we find* other respects in which the EIR was defective we should describe them for the guidance of the parties. We have examined all of appellant's other contentions and find them to be *without merit.* If the *PCL*/tiering problem had not arisen, we would have affirmed the judgment. Section 21005, subdivision (c) does not require us to lengthen this opinion by addressing in detail why we *reject* appellant's other contentions. Appellant's supplemental reply brief so concedes: "The court's discussion of all aspects of CEQA noncompliance is respectfully requested, while areas of compliance are not required to be addressed."

This suggests that respondent may be able to cure the *PCL* problem by awaiting action by the DWR complying with the *PCL* decision, then issuing

a subsequent EIR, supplement to EIR, or addendum to EIR (Guidelines, §§ 15162, 15163, 15164) tiering upon a newly certified Monterey Agreement EIR. Appellant itself so suggests.

Like the court in *PCL, supra*, 83 Cal.App.4th at page 926 and footnote 16, we leave to the trial court's discretion whether to enjoin all or portions of respondent's project pending completion of an adequate EIR. The trial court is in a better position than this court to determine factually the current status of the *PCL* litigation or of a new Monterey Agreement EIR.

## DISPOSITION

The judgment is reversed. The trial court shall issue a writ of mandate vacating the certification of the EIR, shall retain jurisdiction until respondent certifies an EIR complying with CEQA consistent with the views expressed in this opinion, and shall consider such orders it deems appropriate under section 21168.9. The parties shall bear their own costs on appeal.

Hastings, J., and Curry, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 17, 2002. Baxter, J., was of the opinion that the petition should be granted.