66 Cal.Rptr.3d 559 (2007)
155 Cal.App.4th 660
SANTA CLARITA ORGANIZATION FOR PLANNING the ENVIRONMENT et al., Plaintiffs and Appellants,
v.
COUNTY OF LOS ANGELES, Defendant and Respondent;
Newhall Land and Farming Company et al., Real Parties in Interest and Respondents.
No. B189116.
Court of Appeal of California, Second District, Division Six.
September 25, 2007.
*561 Law Office of Alyse M. Lazar and Alyse M. Lazar, Westlake Village, for Plaintiffs and Appellants.
Rossmann & Moore, Antonio Rossmann, Roger Brannon Moore, San Francisco, and David Rowen, for amicus curiae The Planning & Conservation League in support of Plaintiffs and Appellants.
Raymond Fortner, County Counsel, Tracy Swann and Lawrence Hafetz, Deputy County Counsel for Defendant and Respondent County of Los Angeles.
Paul, Hastings, Janofsky & Walker, Robert I. McMurry, Ann Catherine Norian, Los Angeles, and Edgar Kalatian, for
Real Parties in Interest and Respondents Newhall Land and Farming Company and Valencia Corporation.
*560 GILBERT, P.J.
In Santa Clarita Organization for Planning the Environment v. County of Los Angeles (2003) 106 Cal.App.4th 715, 131 Cal.Rptr.2d 186 (Scope I), we held that the water service portion of an environmental impact report (EIR) must analyze the actual amount of water that will be available for a project. In Scope I, the EIR for the West Creek residential subdivision did not comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1] It relied on contractual entitlements to water. Because this water is not of the "wet" variety, it has been called "paper water."
After remand, the County of Los Angeles (County) revised and recertified the West Creek EIR. Santa Clarita Organization for Planning the Environment (SCOPE) again challenges the water services portion of the EIR. This time, SCOPE focuses on the EIR's analysis of a water transfer agreement and remediation costs for perchlorate contamination of water wells. The trial court denied SCOPE's petition for writ of administrative mandate.
After the trial court denied SCOPE'S petition, our Supreme Court decided Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova (2007) 40 Cal.4th 412, 53 Cal.Rptr.3d 821, 150 P.3d 709 (Vineyard). Vineyard states four principles governing the analysis of the water services portion of an EIR. Arguably under principle four, a current source of water could be uncertain in the future. But that uncertainty is more chimerical than actual. We conclude the *562 West Creek EIR satisfies all four principles.

FACTS

Background
In the 1950s, the Legislature and the voters approved the State Water Project (SWP). It was designed to deliver 4.23 million acre-feet of water annually. It is managed by the Department of Water Resources (DWR).
The DWR contracted to deliver water to water agencies throughout the state. The contracts entitle the agencies to specified amounts of water calculated on the designed capacity of the SWP. Only half of the SWP was constructed. The completion of the SWP was an expectation that has not grown beyond a hope. There is no reasonable expectation that it will ever be completed. This leaves a vast difference between the amount of water to which the local agencies are entitled, and the amount of water the SWP can actually deliver.
A drought in the 1990s highlighted the disparity between water entitlements and actual water. Agricultural and urban agencies disputed how shortfalls in water delivery would be allocated. The interested parties met in Monterey, and produced the Monterey Agreement.
Under the Monterey Agreement, the DWR and the contracting water agencies agreed to a statement of 14 principles. One principle provided for the permanent sale of water among agencies. The Castaic Lake Water Agency (Castaic) purchased 41,000 acre-feet per year (afy) from the Kern County Water Agency. Castaic serves the Santa Clarita Valley area, and the 41,000 afy constitutes over 40 percent of the 95,200 afy available to Castaic.
The Monterey Agreement scuttled the term "entitlement" to describe the amount of water the SWP has contracted to deliver to local water agencies. Instead, the agreement uses the term "Table A Amount." Table A of the agreement lists the contracting agencies and the amount of water the SWP has contracted to deliver. The change is not substantive.
In Planning & Conservation League v. Department of Water Resources (2000) 83 Cal.App.4th 892, 100 Cal.Rptr.2d 173 (PCL), the court ordered the EIR for the Monterey Agreement decertified. The court determined that the EIR was prepared by the wrong lead agency, a water agency instead of the DWR, and failed to consider the "no project" alternative. Because the EIR for the Kern-Castaic 41,000 afy transfer was "tiered" on the Monterey Agreement EIR, the EIR for the Kern-Castaic transfer was also ordered decertified. (Friends of Santa, Clara River v. Castaic Lake Water Agency (2002) 95 Cal. App.4th 1373, 1387, 116 Cal.Rptr.2d 54 (Friends),) Although the EIRs for the Monterey Agreement and the Kern-Castaic transfer were decertified, the projects were not enjoined. The agreements remain in effect to this day.
On July 22, 2002, the parties to the PCL litigation that decertified the Monterey Agreement EIR entered into a settlement agreement approved by the Sacramento County Superior Court. The settlement agreement requires the DWR as the lead agency to prepare a new EIR for the Monterey Agreement. The settlement agreement acknowledges that certain water transfers listed in Attachment E to the settlement agreement are final, and the parties agree not to challenge those transfers. The Kern-Castaic transfer is not listed in Attachment E. Instead, the settlement agreement provides:
"Acknowledgement and Agreement Regarding Kern-Castaic Transfer. With respect to ... the Kern-Castaic Transfer, *563 the Parties recognize that such water transfer is subject to pending litigation in the Los Angeles County Superior Court following remand from the Second District Court of Appeal (See Friends of the Santa Clara River v. Castaic Lake Water Agency, 95 Cal.App.4th 1373, 116 Cal.Rptr.2d 54 (2002); review denied April 17, 2002). The Parties agree that jurisdiction with respect to that litigation should remain in that court and that nothing in this Settlement Agreement is intended to predispose the remedies or other actions that may occur in that pending litigation."
In 2004, Castaic certified a revised EIR for the Kern-Castaic transfer. This EIR is not tiered on the Monterey Agreement EIR. Castaic's EIR is currently under challenge in Los Angeles County Superior Court by environmental groups.

West Creek
West Creek is a proposed mixed residential and commercial development in the Santa Clarita Valley area of northern Los Angeles County. The project includes 2,545 housing units, 180,000 square feet of commercial retail space and 46 acres of community facilities. The County served as the lead agency in preparing the EIR for the project. The project developers are The Newhall Land and Farming Company and Valencia Corporation (hereafter collectively Newhall).
SCOPE challenges the County's certification of the West Creek EIR. The trial court denied SCOPE'S petition for a writ of administrative mandate. We reversed on the ground that the EIR's evaluation of the availability of the water supply was inadequate. (Scope I, supra, 106 Cal. App.4th 715, 131 Cal.Rptr.2d 186.) The EIR relied on water entitlements instead of actual water in analyzing water availability. (Ibid.)
The County revised the water supply analysis, and recertified the EIR. SCOPE challenges the water supply analysis in the recertified EIR. This time it opposes the 41,000 afy Kern-Castaic water transfer.
The recertified EIR states that Castaic's total maximum SWP water allocation is 95,200 afy. The Kern-Castaic transfer accounts for 41,000 afy of that. The EIR acknowledges that the EIR for the Monterey Agreement and the original EIR for the Kern-Castaic transfer were decertified.
With regard to the status of the Kern-Castaic transfer, the EIR states:
"The [Kern-Castaic] transfer of SWP Table A Amount was the type of water transfer that fell within the provisions of the Monterey Agreement. As stated above, under the Monterey Agreement, certain SWP agricultural contractors agreed that 130,000 AF of their Table A Amount could be transferred to urban contractors. The [Castaic] 41,000-AF acquisition was a part of the 130,000 AF of SWP Table A Amount, which has been transferred under the Monterey Agreement.
"... The Monterey Agreement provides ... for those transfers by the participating SWP contractors, thus facilitating transfers of Table A Amounts from agricultural to urban SWP contractors. As stated above, the environmental documentation for the Monterey Agreement has been decertified. However, the ... legal proceedings (Planning and Conservation League v. Department of Water Resources (2000) 83 Cal.App.4th 892, 100 Cal.Rptr.2d 173 [PCL litigation]) did not invalidate ... the Monterey Agreement or enjoin[ ] either the Monterey Agreement or further implementation of the Monterey Agreement.
"In addition, the subsequent Settlement Agreement in the PCL litigation did not *564 invalidate or otherwise enjoin the Monterey Agreement.
"Even in the absence of the Monterey Agreement, [Castaic's] permanent acquisition of an additional 41,000 AF of SWP Table A Amount could occur under existing SWP water supply contract provisions, subject to appropriate environmental review.
"Nothing in the existing SWP water supply contracts, or applicable law, prohibit such water transfers with or without the Monterey Agreement. The Monterey Agreement simply provides a specific vehicle for accomplishing transfers of SWP Table A Amounts from agricultural to urban SWP contractors; the amendments under the Monterey Agreement are not the exclusive means by which that Amount may be transferred. In support of that fact, in 1981 (almost 15 years before the Monterey Agreement), the entire SWP Table A Amount of the Hacienda Water District was permanently transferred to the Tulare Lake Basin Water Storage District, pursuant to an agreement approved by DWR.
"The acquisition could proceed as a water transfer under existing law. See, e.g., Water Code §§ 382, 383 (authority for transferring surplus water) and Water Code §§ 1745, et seq. (authority for transferring non-surplus water). The Kern County Water Agency has reaffirmed its willingness to allow transfers of up to 130,000 AF of SWP table A Amounts under pre-Monterey Agreement conditions and/or under the terms of the Settlement Agreement....
"Finally, [Castaic] is not a party to the pending Monterey Agreement litigation (Planning Conservation League v. Department of Water Resources (2000) 83 Cal.App.4th 892, 100 Cal.Rptr.2d 173). Although not a party, an adverse final judgment invalidating the Monterey Agreement could affect [Castaic's] completed acquisition of the 41,000 AF, which could in turn impair [Castaic's] supply of SWP water through its contracts with DWR and other SWP contractors. Nevertheless, [Castaic] believes that an adverse outcome in the Monterey Agreement litigation is not likely to adversely affect [Castaic's] water supplies over the long-term because (a) [Castaic] believes that such a result is unlikely to `unwind' executed and completed agreements with respect to the permanent transfer of SWP water amounts; (b) existing SWP water supply contract provisions allow such transfers (without the need for the Monterey Agreement); and (c) existing law enables [Castaic] to enter into contracts outside the context of the Monterey Agreement."
The EIR also discloses that there is perchlorate contamination in six water wells that will comprise part of the water service for West Creek. The EIR identifies remediation measures, but does not identify any source of funding for those measures.

DISCUSSION

I
Newhall contends the doctrine of law of the case bars SCOPE'S Kern-Castaic transfer arguments.
Where an appellate court states in its opinion a principle or rule of law necessary to its decision, that principle or rule becomes the law of the case. (Clemente v. State of California (1985) 40 Cal.3d 202, 211, 219 Cal.Rptr. 445, 707 P.2d 818.) The law of the case must be adhered to both in the lower court and upon subsequent appeal. (Ibid.) This is true even if the court that issued the opinion becomes convinced *565 in a subsequent consideration that the former opinion is erroneous. (Ibid.)
But our former opinion in this case (Scope I) stated no principle or rule of law bearing on the adequacy of the West Creek EIR's discussion of the Kern-Castaic transfer. Newhall attempts to turn silence into positive effect by citing section 21005, subdivision (c). The subdivision requires that our opinion discuss all the alleged grounds for noncompliance with CEQA. Newhall concludes that because we did not discuss the Kern-Castaic transfer in Scope I, we approved the transfer.
Newhall cites no authority, however, for the proposition that not discussing an issue as required by section 21005, subdivision (c), transforms that issue into law of the case. In Friends, supra, 95 Cal.App.4th at page 1387, 116 Cal.Rptr.2d 54, on which Newhall relies, after finding one of appellant's contentions meritorious, the court expressly stated it considered all of appellant's other contentions and found them without merit. (Ibid.) Friends does not discuss the effect of a failure to consider an issue, and does not even mention the doctrine of law of the case. If Newhall believed we failed to discuss an issue raised in Scope I, its remedy was a timely petition for rehearing. (Cal. Rules of Court, rule 8.268 (formerly cited as rule 25).) The time for such a petition has long since passed.
Moreover, we discussed all issues raised in Scope I. SCOPE mentioned the Kern-Castaic transfer in its opening brief, but SCOPE did not raise the transfer as an issue. In fact, Newhall argued that we could not consider Friends, the decision that decertified the Kern-Castaic transfer EIR, because it occurred after the County approved the West Creek project. Newhall pointed out that once a project is approved, new information does not require reopening the approval. (Scope I, supra, 106 Cal.App.4th at p. 723, 131 Cal. Rptr.2d 186.) SCOPE replied that it cited Friends only to show that SWP entitlements cannot be taken at' face value. (Ibid.) Thus, at Newhall's urging, we did not consider in Scope I the issues SCOPE now raises. They arose after the County's initial approval of the project. Newhall cites no authority that prevents us from considering issues that arose prior to the recertification of the EIR.[2]

II
Newhall contends SCOPE waived its perchlorate contamination arguments by failing to appeal them. Newhall argues SCOPE'S claim is waived because it is essentially identical to that denied by the trial court in the first challenge to the project's EIR.
But SCOPE'S first challenge to the project's EIR concerned disclosure of the extent of perchlorate contamination of local water wells. SCOPE did not appeal the trial court's denial of that challenge. Here SCOPE is not challenging the EIR's disclosure of the extent of perchlorate contamination. Instead, it is challenging the mitigation measures suggested by the EIR. That issue is not substantially identical to the issue raised in the first challenge. There has been no waiver.

III
We now consider SCOPE'S challenge to the West Creek EIR. An EIR approved by the appropriate governmental *566 agency is presumed adequate, and the party challenging the EIR has the burden of showing otherwise. (Barthelemy v. Chine-Basin Mun. Water Dist. (1995) 38 Cal. App.4th 1609, 1617, 45 Cal.Rptr.2d 688 (Barthelemy).) A party may challenge an EIR by showing the agency has abused its discretion either by reaching factual conclusions unsupported by substantial evidence or by failing to proceed in the manner CEQA provides. (Vineyard, supra, 40 Cal.4th at p. 435, 53 Cal.Rptr.3d 821, 150 P.3d 709.)
In evaluating an EIR for CEQA compliance, we must adjust our scrutiny to the nature of the alleged defect. (Vineyard, supra, 40 Cal.4th at p. 435, 53 Cal. Rptr.3d 821, 150 P.3d 709.) Where the alleged defect is that the agency's conclusions are not supported by substantial evidence, we must accord deference to the agency's factual conclusions. (Ibid.) We may not weigh conflicting evidence to determine who has the better argument. (Ibid.) Thus we may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. (Ibid.)
Where the alleged defect is that the agency has failed to proceed in a manner provided by CEQA, our review is de novo. (Vineyard, supra, 40 Cal.4th at p. 435, 53 Cal.Rptr.3d 821, 150 P.3d 709.) An agency that fails to require an applicant to disclose information mandated by CEQA and to include that information in the EIR, fails to proceed in a manner prescribed by CEQA. (Ibid.) Where a party challenges an EIR because it fails to disclose evidence that conflicts with its conclusions, the party must show that the failure to disclose the conflicting evidence precludes informed decision making or informed public participation. (Barthelemy, supra, 38 Cal. App.4th at p. 1617, 45 Cal.Rptr.2d 688.)

IV
SCOPE challenges the adequacy of the EIR's water supply analysis as it relates to the Kern-Castaic transfer.
Recently, our Supreme Court in Vineyard articulated four principles for analysis of future water supplies under CEQA:
"First, CEQA's informational purposes are not satisfied by an EIR that simply ignores or assumes a solution to the problem of supplying water to a proposed land use project. Decision makers must, under the law, be presented with sufficient facts to `evaluate the pros and cons of supplying the amount of water that the [project] will need.' [Citation.]" (Vineyard, supra, 40 Cal.4th at pp. 430-431, 53 Cal.Rptr.3d 821, 150 P.3d 709.)
"Second, an adequate environmental impact analysis for a large project, to be built and occupied over a number of years, cannot be limited to the water supply for the first stage or the first few years. While proper tiering of environmental review allows an agency to defer analysis of certain details of later phases of long-term linked or complex projects until those phases are up for approval, CEQA's demand for meaningful information `is not satisfied by simply stating information will be provided in the future.' [Citation.]" (Vineyard, supra, 40 Cal.4th at p. 431, 53 Cal.Rptr.3d 821, 150 P.3d 709.)
"Third, the future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations (`paper water') are insufficient bases for decision-making under CEQA. [Citation.] An EIR for a land use project must address the impacts of likely future water sources, and the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability. [Citation.]" (Vineyard, supra, 40 *567 Cal.4th at p. 432, 53 Cal.Rptr.3d 821, 150 P.3d 709).
"Finally, where [even a full discussion leaves some uncertainty regarding actual availability of the] anticipated future water sources, ... CEQA requires some discussion of possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies. [Citation.] The law's informational demands may not be met, in this context, simply by providing that future development will not proceed if the anticipated water supply fails to materialize. But when an EIR makes a sincere and reasoned attempt to analyze the water sources the project is likely to use, but acknowledges the remaining uncertainty, a measure for curtailing development if the intended sources fail to materialize may play a role in the impact analysis. [Citation.]" (Vineyard, supra, 40.Cal.4th at p. 432, 53 Cal.Rptr.3d 821, 150 P.3d 709.)
The West Creek EIR does not simply ignore or assume a solution to the problem of supplying water to the project. It identifies specific water sources, including the Kern-Castaic transfer. Nor is the EIR's water supply analysis limited to the first stage or the first few years of the project. The EIR analyzes the Kern-Castaic transfer as part of the permanent supply for the entire project.
SCOPE'S concerns center on the third principle articulated in Vineyard, that "the future water supplies identified and analyzed must bear a likelihood of actually proving available...." (Vineyard, supra, 40 Cal.4th at p. 432, 53 Cal.Rptr.3d 821, 150 P.3d 709.)
SCOPE challenges the EIR's conclusion that an adverse outcome in the Monterey Agreement litigation is unlikely to affect Castaic's water supplies over the long term. The EIR supports this conclusion by stating that an adverse outcome in the Monterey Agreement litigation is unlikely to "unwind" existing agreements for permanent transfer of SWP water amounts, and that existing law and contracts allow transfers without the need for the Monterey Agreement.
SCOPE argues the EIR fails to disclose that the Kern-Castaic transfer is not final and permanent. SCOPE points out that the Kern-Castaic transfer is not included among the water transfers listed as final and permanent in the Monterey Settlement Agreement.
But the Monterey Settlement Agreement makes it clear that the Kern-Castaic transfer is not listed among the final transfer agreements because its EIR is subject to pending litigation in the Los Angeles Superior Court. (Citing Friends, supra, 95 Cal.App.4th 1373, 116 Cal.Rptr.2d 54.) SCOPE points to no evidence that the parties to the Monterey Settlement Agreement consider the transfer as anything other than permanent now that the revised EIR for the transfer has been certified. The Monterey Settlement Agreement did not make the Kern-Castaic transfer temporary. A disclosure that the Monterey Settlement Agreement does not include the Kern-Castaic transfer on its list of final transfer agreements adds nothing substantial to an understanding of water availability.
In California Oak Foundation v. City of Santa Clarita (2005) 133 Cal.App.4th 1219, 1237-1238, 35 Cal.Rptr.3d 434, the court reviewed the adequacy of the discussion of the Kern-Castaic transfer contained in an EIR for an unrelated project. The court determined the EIR was inadequate because it failed to discuss the legal uncertainty of the Kern-Castaic transfer; specifically, the uncertainty created by the decertification of the transfer's original EIR.
*568 In contrast, here the EIR discloses that the Monterey Agreement litigation makes the Kern-Castaic transfer legally uncertain. The EIR states that a judgment invalidating the Monterey Agreement could affect Castaic's acquisition of the 41,000 acre feet of water. The EIR concludes, however, that as a practical matter an adverse outcome in the Monterey Agreement litigation is unlikely to "unwind" the transfer agreement. Contrary to SCOPE'S argument, this conclusion is supported by reasoned analysis. The EIR points out that the Kern-Castaic transfer is intended to be permanent, and that the transfer can be valid even without the Monterey Agreement.
SCOPE argues the Monterey Agreement is necessary to validate the Kern-Castaic transfer because all transfers of SWP water require the DWR's consent. SCOPE cites no authority that expressly requires the DWR's consent for water transfers. Instead, SCOPE reasons the DWR's consent is required because it controls the SWP facilities necessary for delivery of the water. Assuming DWR's consent is necessary, SCOPE cites no authority that the consent must come through the Monterey Agreement. In fact, the EIR discloses that the transfer of surplus and nonsurplus water is authorized by statute. (Water Code, §§ 382, 383, 1745 et seq.) The EIR also notes that at least one Table A Amount of water was permanently transferred with the DWR's consent almost 15 years prior to the Monterey Agreement.
Quite aside from, the Monterey Agreement, the legislative policy of this state is to facilitate water transfers. (See Water Code, §§ 475, 480 et seq.) SCOPE points to no evidence whatsoever that the DWR has any inclination to disapprove the Kern-Castaic transfer even if the Monterey Agreement is ultimately invalidated.
SCOPE points to a letter from the DWR to Castaic dated July 30, 2004. The letter is in an appendix to the West Creek EIR. The letter states that the DWR staff has reviewed the draft EIR for the Kern-Castaic transfer and found that the document "adequately and thoroughly discusses the proposed project and its impacts," and provides a good discussion of the relationship between the Kern-Castaic transfer and the current Monterey Agreement process. The letter also states that the DWR is using a new model to assess the potential impacts of Table A transfers in preparing the revised Monterey Agreement, EIR. It acknowledges that Castaic used an earlier model to analyze the effect of the Kern-Castaic transfer. It states that the use of the new model "may cause slight changes in results, which may lead DWR to different conclusions than the conclusions made by [Castaic] in the current EIR." Nevertheless, the letter states Castaic's draft EIR adequately discusses SWP reliability and pre- and post-Monterey Agreement conditions.
SCOPE argues the West Creek EIR is deficient in that it fails to include or discuss information that a new water model may lead the DWR to different conclusions than those made by Castaic and its draft EIR. But the letter describes any possible change in result as "slight." The letter does not state that the slight change in results will probably lead to different conclusions; it says only that it "may" lead to unspecified different conclusions. It is highly improbable that a slight change in results will lead to radically different conclusions. In fact, the letter praises the draft EIR's discussion of the proposed project and its impacts. The information contained in the letter adds nothing substantial to West Creek's EIR.
SCOPE argues the EIR is devoid of any factual discussion of the impacts of the *569 PCL decision on the West Creek project. But the EIR discloses that a final judgment invalidating the Monterey Agreement could impair Castaic's supply of SWP water. The EIR goes on to state that such a result is unlikely because the Kern-Castaic transfer can be validated outside the Monterey Agreement. SCOPE cites no authority for the proposition that the West Creek EIR must discuss the factors the DWR will be required to consider in preparing a revised Monterey Agreement EIR. The Kern-Castaic transfer is not dependent on the Monterey Agreement. Such a discussion is not necessary for informed decision making or public participation.
SCOPE cites Vineyard, supra, 40 Cal.4th at p. 440, 53 Cal.Rptr.3d 821, 150 P.3d 709, for the proposition that it is improper for an EIR to tier from an environmental document that will be completed in the future. SCOPE points out that West Creek's EIR was certified without waiting for the DWR to complete its revised EIR for the Monterey Agreement. But West Creek's EIR was hot tiered on future Monterey Agreement environmental documents. In fact, West Creek's water supply analysis is based on the premise that the Monterey Agreement litigation is unlikely to affect the Kern-Castaic transfer.
West Creek's EIR satisfies the third principle of analysis stated in Vineyard. The record contains substantial evidence demonstrating a reasonable likelihood that water from the Kern-Castaic transfer will be available for the project's near- and long-term needs. (See Vineyard, supra, 40 Cal.4th at p. 437, 53 Cal.Rptr.3d 821, 150 P.3d 709.) The record also shows the County proceeded in a manner required by CEQA. The EIR neither improperly used tiering to defer all analysis of supplies to future stages of the project, nor relied upon demonstrably illusory supplies. (Ibid.)
SCOPE argues that West Creek's EIR is deficient in because it fails to analyze the project's water supply in the absence of the 41,000 afy Kern-Castaic transfer. The fourth principle of water supply analysis stated in Vineyard is that where "[a full discussion leaves some uncertainty regarding actual availability of the] anticipated future water sources, ... CEQA requires some discussion of possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies. [Citation.]" (Vineyard, supra, 40 Cal.4th at p. 432, 53 Cal.Rptr.3d 821, 150 P.3d 709.)
Here West Creek's EIR acknowledges there is at least some legal uncertainty about the Kern-Castaic transfer. The EIR states in part: "An adverse final judgment invalidating the Monterey Agreement could affect [Castaic's] completed acquisition of the 41,000 AF, which could in turn impair [Castaic's] supply of SWP water through its contracts with DWR and other SWP contractors."
Newhall argues the EIR concludes the Kern-Castaic transfer water is available, it has been contracted and paid for, and is flowing. Newhall claims that uncertainty arising from litigation challenging an EIR is not the type of uncertainty the court addressed in Vineyard.
It is true that the facts in Vineyard did not require the court to specifically discuss a legal uncertainty. But nothing in Vineyard limits the type of uncertainty that triggers the requirement to discuss replacement sources should anticipated sources of water become unavailable. It is the fact of uncertainty, not its source, that requires analysis. And what we can say with certainty is that the outcome of litigation is seldom certain. But whatever the outcome of the PCL litigation, it is highly *570 unlikely it will affect the Kern-Castaic water transfer.
The water is available, and for years has been available for the project under executed agreements. The recertified EIR notes that the Kern-Castaic transfer can legally occur without the Monterey Agreement. Suffice it to say, it is certain enough that however the Monterey Agreement litigation is eventually decided, the Kern-Castaic transfer will likely not be affected. Unlike the degree of uncertainty in Vineyard, here the degree of uncertainty is insubstantial. "Some uncertainty" is not the same as any conceivable certainty.

V
SCOPE contends West Creek's EIR is deficient in that it fails to discuss the impact of the lack of funding to remediate perchlorate contamination of local water wells. SCOPE has no quarrel with the EIR's discussion of perchlorate contamination of local wells. Its contention is limited to the lack of funding for remediation measures.
In addition to SWP water, two local aquifers will serve as part of the project's water supply, the Alluvial Aquifer and the Saugus Aquifer. SCOPE argues there are 67 wells owned by water companies in these aquifers and an undisclosed number of private wells. SCOPE points to evidence that the estimated cost of remediation is $500,000 per well. No source of funding is identified in the EIR to pay for the equipment necessary for remediation.
SCOPE relies on Federation of Hillside & Canyon Associations v. City of Los Angeles (2000) 83 Cal.App.4th 1252, 1261-1262, 100 Cal.Rptr.2d 301 (Federation). There the city adopted a general plan framework (GPF) as part of its general plan. The GPF identified mitigation measures, including a transportation plan designed to mitigate the transportation impacts of the GPF's growth policies. The transportation plan acknowledged that to implement the mitigation measures would require the cooperation of various public agencies, that the city's portion of the costs would exceed its revenues, and that there is "great uncertainty" whether the mitigation measures would ever be funded or implemented. Although the city adopted the mitigation measures, it made no effort to ensure they will actually be implemented or enforceable. The court determined that the city's approval of the GPF must be vacated for failing to ensure that feasible mitigation measures will actually be implemented. (Id. at p. 1261, 100 Cal.Rptr.2d 301, citing §§ 21002.1, subd. (b); 21081.)
Here, although water agencies may have 67 wells, only six of them have been identified as being contaminated with perchlorate. Unlike the city in Federation, here the County did not acknowledge there is great uncertainty that mitigation measures would ever be funded or implemented. To the contrary, the EIR states in part: "Due to the high value of this local water resource, the purveyors have placed a high priority on replacing the impacted groundwater capacity by installing wellhead treatment and the construction of new wells." Here, unlike Federation, there is nothing to suggest the mitigation measures will not be implemented. Finally, SCOPE points to nothing in Federation or any other case that requires the EIR to discuss funding for mitigation measures.

DISPOSITION
The judgment is affirmed. Costs on appeal are awarded to respondents and real parties in interest.
We concur: COFFEE and PERREN, JJ.
NOTES
[1] All statutory references are to the Public Resources Code unless otherwise stated.
[2] SCOPE contends the EIR's failure to properly analyze the Kern-Castaic transfer violated the terms of the remittitur in Scope I. It follows from what we have said that the contention has no merit. We did not consider the Kern-Castaic transfer in Scope I, and it was not within the terms of our remittitur in that case.